In re HARROW LEASING
CORPORATION, Debtor.

LASALLE NATIONAL BANK AS
TRUSTEE U/A DATED MAY 5,
1981, Plaintiff,

v.

HARROW LEASING CORPORATION,
Defendant.

Bankruptcy No. 83–02653G.
Adv. No. 83–1833G.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 21, 1983.

Marjorie O. Rendell, Duane, Morris & Heckscher, Philadelphia, Pa., and James E. Spiotto, William P. Smith, Chapman & Cutler, Chicago, Ill., for plaintiff, LaSalle Nat. Bank.

Marc J. Sonnenfeld, Jami Wintz McKeon, Mark M. McGuire, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant/debtor, Harrow Leasing Corp.

## OPINION

EMIL F. GOLDHABER, Bankruptcy Judge:

The issue in the case *sub judice* is whether we should modify the automatic stay imposed by section 362(a) of the Bankruptcy Code ("the Code") in order to permit the plaintiff to proceed with foreclosure of the debtor's aircraft. We conclude that the plaintiff is entitled to such relief because its interest is not adequately protected in that: (1) the debtor has no equity in the subject aircraft; (2) the debtor's "plan" to adequately protect the plaintiff is, at this juncture, mere conjecture and cannot, therefore, serve as adequate protection of the plaintiff's interest; and (3) the plaintiff is not otherwise adequately protected.

The facts of the instant case are as follows:[1] Harrow Leasing Corporation ("the debtor") filed a petition for reorganization under chapter 11 of the Code on June 30, 1983. In 1981, the debtor purchased from Fokker B.V. ("Fokker") a Model F–28 4000 aircraft ("the aircraft") which was, in turn, to be leased to Altair Airlines, Inc. ("Altair"). Only $1.6 million of the $9.1 million purchase price of the aircraft was paid at

---

1. This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 (effective August 1, 1983).

the time of purchase. The debtor financed the remaining $7.5 million by borrowing $3.75 million from the Algemene Bank Nederland ("ABN") and Amsterdam-Rotterdam Bank N.V. ("Am-Ro"), as evidenced by certain notes ("the notes").[2] In connection with the said purchase, LaSalle National Bank ("LaSalle") acted as security trustee for ABN and Am-Ro and, in that capacity, LaSalle entered into a security agreement with the debtor on May 5, 1981 ("the security agreement").[3] (LaSalle, ABN and Am-Ro are collectively referred to hereinafter as the "secured lenders").

On May 5, 1981, the debtor and Altair executed an equipment lease agreement pursuant to which Altair leased the aircraft from the debtor. Altair used the aircraft in its business until it filed a petition for reorganization under chapter 11 of the Code on November 9, 1982. Consequently, Altair, which had been making the payments due under the equipment lease directly to the secured lenders, did not make the payment due under the equipment lease on November 1, 1982. As a result thereof, the secured lenders notified the debtor that it was in default under the notes and that the debt owed by the debtor to the secured lenders had been accelerated. The debt in question is non-recourse, meaning that the secured lenders could look only to the aircraft for satisfaction of any monies owed by the debtor.

Under the terms of the security agreement, the debtor, upon default, had the right to claim a grace period of 210 days during which time the secured lenders could not exercise any of their default remedies and the debtor, under certain conditions, could attempt to put the aircraft back in service.[4] Nevertheless, the 210 day grace period expired and LaSalle thereafter

scheduled a public sale of the aircraft for June 30, 1983, but said sale was stayed by the filing of the debtor's chapter 11 petition on that same day. Consequently, on July 12, 1983, LaSalle, on behalf of the secured lenders, filed a complaint seeking relief from the automatic stay under section 362(d) of the Code in order to permit the secured lenders to foreclose on their interest in the subject aircraft.

Section 362(d) of the Code provides when relief from the stay shall be granted:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or
> >
> > (2) with respect to a stay of an act against property, if—
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d) (1979).[5]

## THE AMOUNT OF THE DEBT

■ At the outset, we must establish the amount due the secured lenders on the notes in question. The secured lenders maintain that the amount owing under the notes is $9.245 million while the debtor contends that the outstanding debt is $7.24 million. The discrepancy as to the amount owing stems from a dispute between the debtor and the secured lenders as to what interest rate was agreed upon when the transaction was consummated. The notes,

**2.** *See* Exhibits P–2 and P–3.

**3.** *See* Exh. P–1.

**4.** *See* § 5.3 of the security agreement (Exh. P–1).

**5.** Section 362(g) allocates the burden of proof in a complaint for relief from the stay as follows:

> (g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—
>
> > (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and
> >
> > (2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362(g) (1979).

which in pertinent part contain identical language, provide:

The Debtor shall pay interest to the holder hereof on the unpaid principal amount hereof from the date hereof until the maturity hereof, whether by acceleration or otherwise, at the rate per annum (computed on the basis of a 360-day year of twelve consecutive 30-day months) determined by adding (i) two and one-half percent (2½%) and (ii) the cost (expressed in terms of a rate per annum computed on the basis of a 360-day year of twelve consecutive 30-day months) to the Bank of acquiring, in the domestic United States dollar market, United States dollars for an initial term (the "Initial Funding Period") commencing on the date hereof (to, but not including, May 1, 1984), an amount equal to the original principal amount of the Note.

\*　　\*　　\*　　\*　　\*　　\*

Such interest rate as so determined has initially been fixed at 18⅞% per annum and the Initial Funding Period has been fixed to be a period commencing the date hereof and continuing to, but not including, May 1, 1984.[6]

There is no dispute that the interest rate on the loan was to be 2½% over the "cost of funds" to the bank (the secured lenders). However, the debtor asserts that the *actual* "cost of funds" to the secured lenders plus the aforesaid 2½% should have been less than the 18⅞% specified in the language above.[7]

In *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3d Cir.1980), the United States Court of Appeals for the Third Circuit stated that when a judge is faced with determining whether the written words before him are ambiguous, it is "the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Id.* at 1011.

We have carefully considered the debtor's arguments that the interest due on the loan is not governed by the contract rate of 18⅞%. We are, however, hard-pressed to find any ambiguity in the notes in question. The only conceivable confusion which might be found in those notes would be in the interpretation of the general formula initially designated on the first page of each note as the benchmark for determining the interest rate, i.e., "cost to the Bank of acquiring U.S. dollars." If the parties involved had agreed only to this general formula, we would necessarily have to ascertain what the true cost of funds were to the bank. However, the parties chose to do otherwise and, on the second page of each note, they explicitly set forth an interest rate of 18⅞% for the initial funding period. While it is possible that the term "cost of funds" may have had a specialized usage that was common to the parties involved herein, none of the evidence proffered in this case remotely suggests that the term 18⅞% meant anything other than 18⅞%. In light of the specific statement of interest and in view of the fact that the debtor is

---

**6.** *See* Exhibits P–2 and P–3.

**7.** According to the debtor, the reason why the cost of funds to the banks was not 16⅜% (plus a 2½% profit margin equals the contract rate of 18⅞%) was because the banks failed to obtain a "matched funding deposit" for the loan in question. As it was explained to us, the term "matched funding" means:

For instance, if a bank were to lend a million dollars for one month to Company Z, it would then seek a deposit for a million dollars for one month from whatever source—certificate of deposit—for a like period and for a like amount. *See* Tr. August 9, 1983 (Nappi) at 11.
The debtor asserts that a specific matched funding deposit was an item negotiated and

agreed to by all parties in connection with the aircraft transaction. Yet, the notes in question make no mention whatsoever of a "matched funding" requirement. Moreover, not only does the evidence controvert the debtor's assertion that the secured lenders had to specifically match fund their loans *in order to determine the interest rate* (*See* deposition of James Connor, who negotiated the transaction on Altair's behalf, and the testimony of Marvin Juliar, who negotiated on behalf of ABN (Tr. 10/13/83 at 19, 11/1/83 at 12)), we find no basis to admit this parol evidence in light of our holding that the relevant language in the notes is unambiguous.

hardly inexperienced in the art of financing,[8] we find little merit in the debtor's assertion that interest due on the loans is not governed by the contract provision of 18⅞%. Further, we note that the debtor, through its lessee Altair, made payments due on the loans pursuant to the contract rate of 18⅞% and challenged the rate only when the loan went into default. To ignore the specific interest rate provisions in the subject notes would, we think, be tantamount to rewriting the contracts entered into by the parties under the guise of contract interpretation. Consequently, we conclude that the notes clearly and unambiguously set forth an interest rate of 18⅞% and that the amount due the secured lenders is to be calculated pursuant thereto.

## THE FAIR MARKET VALUE OF THE AIRCRAFT

The debtor asserts that the fair market value of the aircraft is $9.25 million. Even if we were to accept that appraisal as being accurate, it becomes obvious, in light of our holding that the interest due on the subject loan is to be calculated at the contract rate 18⅞%, that the debtor possesses no equity in the aircraft.[9] We are, in any event, unable to conclude that the fair market value of the subject aircraft is $9.25 million.

The expert for the secured lenders testified that the aircraft has a fair market value of $7.5 million. However, at trial of the instant complaint, we ruled that the secured lenders' expert was biased because it was discovered that he was a director of

8. The debtor is a 76% subsidiary of Lease Financing Corporation ("LPC"), described during the course of these proceedings as one of the most knowledgeable firms in the leverage—leasing business in the United States (Tr. 9/8/83 at 17 Goldstein). The ultimate parent of both LPC and the debtor is Superior Tube Company, the tax owner of the aircraft. Rich-

ard Caruso, who negotiated the aircraft transaction on behalf of the debtor, testified that he has been involved in over 100 leverage lease transactions (Tr. 9/9/83 at 60 Caruso).

9. As of November 1, 1983, the total amount due under the loans was calculated to be:

| | | |
|---|---|---|
| 1) Principal | | $7,346,897.38 |
| 2) Contract interest $3,852.02 per day from August 1, 1982 until November 1, 1983, on a 360 day basis or 450 days | | 1,733,409.00 |
| 3) Penalty interest | | $9,080,306.38 |
| a) penalty rate (1%) 11/1/82 to 11/16/82 on unpaid past due principal of $55,694.70 | $ 23.20 | |
| b) penalty rate (1%) 11/17/82 to 11/1/83 on unpaid principal following acceleration –$204.08 for 345 days | 70,407.80 | |
| c) penalty rate (1%) 11/1/82 to 11/1/83 on interest past due as of 11/1/82 ($346,793.50) = $9.63 for 360 days | $3,466.50 73,897.50 | $9,154,203.88 |
| 4) Expenses | | |
| a) insurance | $35,000.00 | |
| b) advertising | 5,771.00 | |
| c) Empire | 14,642.47 | |
| d) legal fees | 125,000.00 $180,413.47 | $9,334,617.35 |
| 5) Prepayment Indemnity for 11/1/83 to 4/30/84 at 11% reemployment rate, or $1,096.93 for 180 days | $197,447.40 | $9,532,064.75 |

See Appendix I to the secured lenders' post-trial brief.

Empire Airlines which, as the secured lenders' expert conceded, has an interest in acquiring the aircraft in question.

At the same time, we are less than convinced by the testimony given by the debtor's expert appraiser who, as previously mentioned, assigned a "value" of $9.25 million to the subject aircraft. First of all, we are not certain that the aforesaid appraisal reflects the *current fair market value* of the aircraft. The debtor's appraiser stated precisely that "I would expect that its value *should rise to* nine and a quarter million in a nondistress circumstance and I would expect that a value like nine and a quarter million should obtain for a period *from two to four years from now*" (emphasis added).[10] On cross-examination the debtor's appraiser testified that "it would take a year to a year and a half" for the value of the aircraft to reach $9.25 million.[11] We find this speculative standard of valuation to be inexpedient. Moreover, we take note that none of the publications relied on by the parties to establish the fair market value of the instant aircraft ascribe a value to that type of aircraft in excess of $8 million.[12] Finally, further doubt is cast on the credibility of the debtor's appraiser by the testimony of the president of Fokker, U.S.A.,[13] who stated that a brand new model of the subject aircraft would cost approximately $10.5 million. The debtor's appraiser, who agreed that a new version of the instant aircraft would cost $10.5 million, acknowledged further that an investment tax credit of some $1 million would be available to the purchaser of the new aircraft, so that the actual cost to said purchaser would be closer to $9.5 million. We cannot believe, as the aforesaid testimony would suggest, that

the difference in value between the subject aircraft, which is two and one-half years old and which has been idled since January, 1983, and a new edition of the same aircraft is a mere $250,000.00; or more precisely, that an available buyer would choose to purchase the aircraft in question ($9.25 million) instead of the advanced model ($9.5 million).[14] Therefore, we conclude that the present fair market value of the instant aircraft is not more than $8 million.

ADEQUATE PROTECTION

The debtor contends, nevertheless, that even if the secured lenders have established a *prima facie* case for modification of the automatic stay, the secured lenders' request for relief must be denied because the interests of the secured lenders are adequately protected in three ways.[15] The findings already set forth in this opinion refute one of the indicia of adequate protection proffered by the debtor, i.e., that there is an equity cushion in the subject aircraft.

The debtor next asserts that the secured lenders are adequately protected because Fokker, the manufacturer of the aircraft, issued a guaranty to the secured lenders, ("the Fokker guaranty") which, according to the debtor, covers at least the amount of principal due and owing to the secured lenders upon sale of the aircraft.[16] The secured lenders, on the other hand, argue that the Fokker guaranty is "irrelevant" in determining whether their interests are adequately protected. We disagree. We have previously held that a third-party guaranty may, under appropriate circumstances, serve as adequate protection of a creditor's interest in the debtor's proper-

---

**10.** *See* Tr. 9/9/83 at 37 (Knowles).

**11.** *See* Tr. 9/20/83 at 16 (Knowles).

**12.** *See* Exh. P–26 ($7.5 million); Exh. P–12 ($7 million); Exh. D–20 ($8 million).

**13.** Fokker, U.S.A. is a subsidiary of Fokker, B.V.

**14.** The debtor's appraiser admitted that the costs of carrying the aircraft until it attained the value he projected would have to be re-

duced from the purchase price of any eventual sale.

**15.** While "adequate protection" is not defined in the Bankruptcy Code, the legislative history of § 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles. *See* H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 339 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787.

**16.** *See* Exh. D–1.

ty.[17] We reaffirm that principle and focus only on the sufficiency of the guaranty in question. The overriding consideration in this regard is that Fokker disputes the scope of its liability under the guaranty. The debtor admits that there is a question as to whether the guaranty covers the interest due on the loans. Moreover, it is Fokker's position, as expressed through the testimony of its finance department manager, that: (1) the guaranty only becomes operative in the event that there is a forced sale of the aircraft; and (2) the guaranty covers only principal and the amount of principal insured declines as the principal should be amortized in accordance with the schedule set forth in the notes regardless of whether the amount of principal is, in fact, reduced.[18]

The debtor relies heavily on the fact that the secured lenders *believe* that their interpretation of the Fokker guaranty will prevail.[19] We think this reasoning misses the point. The critical difficulty with the Fokker guaranty is that it is a disputed "guaranty" over which the possibility of litigation prevails. And while the guaranty obviously speaks for itself, we find it dispositive, for purposes of determining whether the secured lenders' interests are adequately protected, that a controversy over the interpretation of said guaranty exists. Consequently, we conclude that the instant guaranty does not constitute adequate protection of the secured lenders' interest in the aircraft.

Finally, the debtor maintains that adequate protection of the secured lender's interest in the aircraft is demonstrated by its proposal to lease the aircraft to Altair, which, in turn, would use the aircraft as part of its plan to operate a casino charter service to Atlantic City. The debtor would then pay to the secured lenders whatever proceeds it received from Altair. At the outset, we need only point out that the feasibility of this proposal depends not only on the likelihood of the instant debtor's reorganization but also on the reorganization of the proposed lessee, Altair, which, as mentioned previously, itself filed a petition for reorganization under chapter 11 of the Code in this court on November 9, 1982.

First and foremost, we are persuaded by the fact that Altair does not, at the present time, have any contract with anyone to fly casino charters. And, while we realize that Altair needs planes to fly before it can charter flights to casinos, we are influenced by the fact that neither the debtor nor Altair produced a single witness to testify that they were willing, ready and able to sign an agreement with Altair in the event the subject aircraft became available.[20]

In further connection with the proposed lease, the record shows that Altair "anticipates" being able to use the subject aircraft for at least 200 hours per month and thereby pay to the debtor a minimum of $100,-000.00 per month.[21] Assuming, *arguendo,* that the aforesaid projections materialized, the lease would still not produce sufficient funds to amortize the debt owed by the debtor to the secured lenders. This becomes evident in light of the testimony of a vice president of one of the secured lenders who testified that it would take $134,000.00 per month just to amortize the principal and "ignoring past due interest and expenses." [22]

Finally, the record does not establish to our satisfaction that either the debtor or Altair have the ability to sustain the type of operation suggested or, more precisely, that either party has the present capacity: (1) to provide for spare parts and for the overall

---

17. *See In re Roane,* 8 B.R. 997 (Bkrtcy.E.D.Pa. 1981) (FHA mortgage insurance constitutes adequate protection of a mortgagee's interest in the debtor's residence) *aff'd,* 14 B.R. 542 (E.D. Pa.1981).

18. *See* Tr. 8/5/83 at 104 (Olde Loohuis).

19. *See* Exhibits D–22; D–30; D–31.

20. Additionally, we point out that the Altair plan contemplates the purchase of two other planes, neither of which have actually been purchased.

21. *See* Tr. 9/20/83 at 57 (Wizon).

22. *See* Tr. 8/5/83 at 31 (Whittington).

maintenance of the aircraft; (2) to provide appropriate insurance for the aircraft; (3) to put the aircraft back into service after its protracted inactivity;[23] and (4) to otherwise obtain working capital. The debtor simply asserts that Altair, as lessee, would be responsible for such costs and any similar expenses. In closing, we note that this "responsibility" has yet to be sanctioned by Altair's creditors or approved by this court in the bankruptcy proceeding of Altair. Consequently, we will grant the secured lenders' request for relief from the automatic stay pursuant to section 362(d)(1) of the Code.

Moreover, we conclude that relief from the stay should be granted under section 362(d)(2) of the Code.[24] It has already been demonstrated that the debtor lacks equity in the aircraft. We conclude further that the aircraft is not necessary for an effective reorganization of the debtor because we do not find that an effective reorganization of the debtor is feasible. As we stated in *In re Dublin Properties,* 12 B.R. 77 (Bkrtcy.E.D.Pa.1981), "[i]f no reorganization of a debtor is feasible, then no property of that debtor can be necessary for that end." *Id.* at 80. The evidence in this case, as previously mentioned under our adequate protection analysis, establishes that the debtor's reorganization is not feasible. And, while a reorganization contemplated along the lines projected by the debtor is not impossible, "such possibility does not amount to proof that an effective reorganization is likely in the near future." *See In re Boca Development Assoc.,* 21 B.R. 624, 628 (Bkrtcy.S.D.N.Y.1982).

To recapitulate, in the instant case, the indebtedness due under the notes has been accelerated and interest continues to accrue at the rate of $3,852.02 per day until the end of the initial funding period (May 1, 1984). No payments have been made to the secured lenders in fifteen months. No income is, in fact, being derived from the aircraft. The debtor lacks equity in the aircraft. Based on all the above, we will grant the secured lenders' request for relief from the automatic stay.

---

23. The subject aircraft has been stored with Empire Airlines at the Oneida County Airport in New York since January, 1983.

24. Section 362(d) permits modification of the automatic stay upon alternative grounds. Relief may be granted under § 362(d)(1) upon a finding that a debtor's interest in property is not adequately protected or under § 362(d)(2) upon a finding that the debtor has no equity in the property and that that property is not necessary to an effective reorganization. *See In re Schramm,* 12 B.R. 608 (Bkrtcy.E.D.Pa.1981); *In re Heath,* 9 B.R. 665 (Bkrtcy.E.D.Pa.1981). In this regard, we note that the concept of equity is not only relevant to subsection (d)(2) of § 362, it is also relevant to subsection (d)(1) on the issue of adequate protection. *See In re DiBona,* 9 B.R. 21 (Bkrtcy.E.D.Pa.1981).