**In re HARRINGTON & RICHARDSON, INC., Phillips Metallurgical, Inc., Debtors.**

Bankruptcy Nos. 4–84–00581–G, 4–84–00582–G.

United States Bankruptcy Court, D. Massachusetts.

March 6, 1985.

John Siegel, Hale & Dorr, Boston, Mass., for debtors.

Jon D. Schneider, Goodwin, Procter & Hoar, Boston, Mass., for Bank of New England, N.A.

J. Robert Seder, Seder & Chandler, Worcester, Mass., for creditors committee.

Howard B. Lenow, Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, Boston, Mass., for union.

MEMORANDUM ON USE OF CASH COLLATERAL

PAUL W. GLENNON, Bankruptcy Judge.

Before the Court is the Motion to Use Cash Collateral filed by the related debtors, Harrington & Richardson, Inc. (hereinafter referred to as "H & R") and Phillips Metallurgical, Inc. (hereinafter referred to as "PMI"). The debtors seek to use $529,000 of the cash collateral of the Bank of New England (hereinafter referred to as the "Bank"), for the period of March 1, 1985 through March 31, 1985. The Bank op-

posed the motion. The Unsecured Creditors' Committee stated that it had no position on the motion. The Union representing the debtors' employees expressed its support for the continued use of cash collateral. An evidentiary hearing was held on March 1, 1985. Prior to the filing of the Motion for Use of Cash Collateral, the Court had entered orders on December 7, 1984, December 14, 1984, and on January 14, 1985, authorizing the debtors to borrow from the Bank, on a secured basis, an amount not to exceed 80% of the debtors' post-petition accounts receivable. The Bank is unwilling to extend further credit.

Based upon the testimony and documentary evidence, the Court issues the following findings of fact and conclusions of law, in accordance with Bankruptcy Rule 7052.

The debtors filed voluntary Chapter 11 petitions on December 3, 1984. H & R is a manufacturer of guns in Gardner, Massachusetts, employing 110 persons. PMI, a wholly owned subsidiary, located in Swanton, Vermont, is a foundry which supplies H & R and other companies.

Prior to the commencement of these cases, the debtors had secured a lending arrangement with the Bank. As of the date of filing, the Bank was owed $5,462,191 and had security in all accounts receivable, inventory, machinery and equipment of both debtors, and a second mortgage on the debtors' Gardner, Massachusetts real estate. There is a first mortgage on the Gardner real estate in the amount of $535,000. Since filing their Chapter 11 petitions, the debtors have reduced their obligations to the Bank by $769,191 to $4,693,000.[1]

Surprisingly, the Bank's assessment of the debtor's current liquidation value exceeds the amount suggested by the debtors. The Bank officer values the debtors' current (as of February 25, 1985) accounts receivables at $1,913,000, whereas, the

companies' president values unsecurable receivables for, liquidation purposes, at $1,600,000.[2] The Bank did not offer any evidence of the value of the PMI inventory, but agreed that the H & R inventory has a current value of $552,000. The debtors' president testified that liquidation value of both companies' inventory is $1,000,000.[3] The Bank asserts that the debtor's $1,175,000 value ascribed to the machinery and equipment did not take into account any liquidation costs (auctioneer's commission, advertising expenses) and, therefore, the Bank's assessment deducts 10% from the debtors' appraisal. Similarly, the Bank's calculations deduct a broker's commission from the appraisal value of the debtors' real estate on a distressed sale basis. The Bank values the debtors' real estate equity at $1,406,000 whereas the debtors omit any broker's fee and value their equity at $1,790,000. Thus, the Bank contends that the liquidation value of the combined assets of the two companies is $4,921,000. Their estimate of liquidation value results in an equity cushion exceeding the debt owed to the Bank by $228,000. The debtors' evidence reveals total asset valuation of $4,892,600, and an equity cushion of approximately $203,000.

Acceptance of either valuation as the Court's ultimate finding is unnecessary because each party's analysis results in a nearly identical evaluation. I find that the liquidation value of the debtors' assets is in the vicinity of $4,900,000, and that the value of the assets exceeds the Bank's debt by at least $203,000.

Since the filing date, the debtors have sustained losses, in December, 1984, in the sum of $110,000, and in January, 1985, in the sum of $85,000. The debtors' president attributed these losses to customers' expressed reluctance to place orders upon notice of the bankruptcies. He believes

---

1. Although the debtors contend in their Proposed Findings that the current debt owed to the Bank is in the amount of $4,554,214, the sole evidence offered at trial was the $4,693,000 figure. The Court cannot accept the figure mentioned in the proposed findings, as it has no evidentiary basis.

2. The total accounts receivable are currently $2,200,000.

3. The book value of the inventory is currently $2,700,000.

that the negative reaction to the filings has been contained, since the company recently attended a trade show and explained that normal operations were continuing. No profit and loss figures for February were introduced by either the debtors or the Bank. It is known, however, that the debtors have a backlog of orders, totalling $7,000,000, and that orders of $700,000 are ready to be shipped. The debtors' accountant, Mr. Gladstone, testified that in view of these orders, the debtors can operate during March of 1985 without a decrease in the value of assets. He estimated that during March, the debtors would generate sales of $1,100,000, for a profit of $50,000 to $125,000. He also projected that the debtors would collect $990,000 in accounts receivable during March. The debtors need $529,000 to operate during March, 1985 for payroll, inventory purchases, utility payments, insurance, and payments to secured parties. Mr. Rowe, president of the debtor corporations, has seriously discussed a sale of the businesses with several parties, who have recently been provided with financial records.

A debtor is entitled to use cash collateral upon proof of adequate protection. 11 U.S.C. § 363. Cash Collateral is: "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).

A creditor with a security interest in the property of the debtor is entitled to "adequate protection." 11 U.S.C. § 363(e). Although "adequate protection" is not fully defined by the Bankruptcy Code, it is generally accepted that this concept requires the debtor to propose some form of relief that will preserve the secured creditor's interest in the collateral. *In re Monroe Park*, 17 B.R. 934, 937 (D.C.Del.1982); 2 Collier on Bankruptcy, ¶ 361.01 at 361-5 (15th Ed.1984). This protection must result in the *"indubitable equivalent* of such entity's interest in such property." 11 U.S.C. § 361(3). *Cf.* 11 U.S.C. §§ 1129(a)(9)(C), 1129(b), 1325(a)(4), ("value as of the effective date of the plan); *In re Fi-Hi Pizza,*

*Inc.,* 40 B.R. 258, 261 (Bankr.D.Mass.1984) ("value as of the effective date of the plan" mandates a test of approximateness). The legislative history makes clear, that the secured creditor may not be deprived of the:

> benefit of [its] bargain.... Though the creditor might not receive his bargain in kind the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* [1978] U.S.Code Cong. & Ad. News 5787, 6295. Such protection, however, is a flexible concept which requires a Court to make decisions on a case-by-case basis. *In re Monroe,* 17 B.R. at 940. As noted by, *In re American Mariner Industries, Inc.,* 734 F.2d 426, 432 (9th Cir.1984),

> We are convinced, therefore, that the case-by-case development, guided by equitable principles as Congress envisioned, must recognize and protect the *value* of a creditor's interest when, as here, that value is demonstrated to exist and is measurably threatened;

*See also, In re Schaller,* 27 B.R. 959; (D.C. W.D.Wis.1983); *In re Elliott Leases Cars, Inc.,* 20 B.R. 893 (Bankr.D.R.I.1982); *La Jolla Mortgage Fund v. Rancho El Cajon Associates,* 18 B.R. 283, 288 (Bankr.S.D. Calif.1982).

In any determination of adequate protection pursuant to §§ 361 and 363, the debtor has the burden of proof on the issue of adequate protection.

One method of providing adequate protection is to prove a sufficient "equity cushion;" that is, the value of the liens provided to the secured creditor exceeds the amount of the secured debt by a sufficient amount to insure payment of the debt in full. *In re Mellor,* 734 F.2d 1396 (9th Cir.1984); *In re Monroe Park,* 17 B.R. 934 (D.Del.1982); *In re Carson,* 34 B.R. 502 (D.Kansas 1983); *In re Johnston,* 38 B.R. 34, 36 (Bankr.D.Vermont 1983); *In re Attinello,* 38 B.R. 609 (Bankr.D.Pa.1984); *In re Tinsley & Groom,* 38 B.R. 457 (Bankr.D.

Ky.1984); *In re Davenport,* 34 B.R. 463 (Bankr.D.Fla.1983); *In re San Clemente Estates,* 5 B.R. 605, 610, 2 CBC 2d 1003, 6 BCD 838 (Bankr.S.D.Calif.1980); *In re Tucker,* 5 B.R. 180, 182, 2 CBC 2d 535 (Bankr.S.D.N.Y.1980); *In re Llewellyn,* 27 B.R. 481, 482 (Bankr.M.D.Pa.1983); *In re McCall,* 25 B.R. 199, 202 (Bankr.E.D.Pa. 1982); *In re Gaslight Village, Inc.,* 8 B.R. 866, 871 (Bankr.D.Conn.1981); *In re 5-Leaf Clover Corp.,* 6 B.R. 463, 466 (Bankr.S.D. W.Va.1980). The Court, however, must be assured that any equity cushion will not dissipate rapidly in the face of adverse events. *In re Johnston,* 38 B.R. 34, 36 (Bankr.D.Vermont 1983); *In re Pitts,* 2 B.R. 476, 478, 1 C.B.C.2d 241, 5 B.C.D. 1129 (Bankr.C.D.Cal.1979). However, that interest can be protected by making periodic cash payments to the secured party to the extent that the debtor's use of the collateral results in a decrease in the value of the secured party's interest or by providing the secured party with an additional or replacement lien. 11 U.S.C. § 361.

To be sure, the "equity cushion" in this case is not substantial, in view of the size of the debt. The evidence adduced at hearing by the debtor established an equity cushion of at least $203,000. The bank's evidence, ironically, proved an equity cushion of $228,000.[4] Still, there is an equity cushion that neither party has disputed. Further, under the borrowing stipulations between the debtors and the bank prior to March 1, the Bank's debt was reduced from approximately $5,400,000 on December 3, 1984, to under $4,700,000 on February 28, 1984. In short, the Bank has gone from an undersecured position to an oversecured position. Even if the debtors were to repeat their disastrous December performance (a loss of approximately $200,000) the

Bank would be marginally oversecured and fully protected. However, the Court does not expect December's losses to be repeated because January's losses were reduced to $85,000.

To focus on the true shortcomings of the Bank's position, a review of the Bank's closing argument is in order. In short, the Bank did not argue that it was unprotected but, rather, that the Bank had been misled continually by the debtors. It asserted that the debtors had provided the Bank with projections of profit for December, 1984 and January, 1985, as compared with actual losses of $200,000 and $85,000, respectively. However, if the debtors have willfully misled the Bank, the remedy is not necessarily a finding of insufficient protection, but rather, in a motion for appointment of a trustee. 11 U.S.C. § 1104. Moreover, I cannot find any willful misrepresentations by the debtors. The accountants responsible for the projections in question were only hired by the debtors in December 1984. Any error made by them can be attributed to their brief tenure and the optimism that usually accompanies initial employment. Moreover, the sudden severe December and (to a lesser extent) January losses were attributed to an unexpected flight of customers that accompanied the filing of the debtors' Chapter 11 petitions, but now has been stemmed and reversed.

■ Accordingly, I find that the Bank's position will not be jeopardized by the debtor's use of cash collateral for the limited period sought. The conditions of the debtor's use of cash collateral were not addressed at the hearing on March 1, 1985 and are now the subject of dispute. Both the Bank and the debtors submitted proposed orders to the Court. The debtors

---

**4.** Both figures are based upon liquidation value analysis. Debtor has argued that

> [w]here collateral is being used in an ongoing business, it may be appropriate to value the collateral at the fair market value as if the collateral was being sold as part of a going concern. *In re Xinde International, Inc.,* 13 B.R. 212, 215 (Bankr.D.Mass.1981); (citing *In re Shockley Forest Industries, Inc.,* 5 B.R. 160 (Bankr.N.D.Ga.1980)). Where, as here, the

debtors have already undertaken to sell their operations as going concerns, such a valuation is clearly appropriate.

However, the mere attempt to sell a business is insufficient to support application of a fair market value standard. At this early date, there is no guarantee or assurance that this business will, in fact, be sold and its accompanying fair market value preserved.

seek to use cash collateral to the extent that new account receivables are generated. It also has proposed to provide the Bank with relevant financial information and to allow the Bank to request an emergency hearing upon the assertion that the debtors have substantially diverged from their projections for the month of March. The Bank proposes that the prior borrowing stipulations be continued for March— that is, that the debtor be allowed to use only 80% of accounts receivables created during March with the remainder being turned over to the Bank. Either proposal may be appropriate in the circumstances of this case. To allow each party the opportunity to argue the merits of their proposed orders, a hearing will be held at 3:00 P.M. on March 6, 1985.