In re DIACONX CORPORATION t/a Computerland of Paoli, Bala Cynwyd and Media, Debtor.

HAMILTON BANK, a Pennsylvania Corporation, Plaintiff,

v.

DIACONX CORPORATION t/a Computerland of Paoli, Bala Cynwyd and Media, Defendant.

Bankruptcy No. 86–00167G.
Adv. No. 86–1372G.

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 13, 1987.

See also, 69 B.R. 343.

Janet M. Sonnenfeld, Philadelphia, Pa., for debtor, Diaconx Corporation.

George J. Shoop, Rhoda, Stoudt & Bradley, Reading, Pa., for plaintiff, Hamilton Bank.

## OPINION

BRUCE FOX, Bankruptcy Judge:

Presently pending before me in this chapter 11 case are (1) the motion of debtor Diaconx Corp. ("Diaconx") for permission to expend estate funds for purchase of a trial transcript in connection with an adversary proceeding which was tried in the district court and (2) the complaint and motion for preliminary injunction of Hamilton Bank ("Hamilton") to enjoin Diaconx's use of cash collateral.[1] On December 3 and 8, 1986, evidentiary hearings were held and these matters were taken under advisement. For the reasons set forth below,[2] Diaconx's motion will be denied and Hamilton's motion will be granted.

---

**1.** Hamilton initially also sought to require that certain cash collateral on account at other financial institutions be transferred to Diaconx's account with Hamilton. This request was abandoned at trial.

**2.** This opinion constitutes the court's findings of fact and conclusions of law pursuant to Bankr. Rules 9014 and 7052. This matter is a core proceeding. 28 U.S.C. § 157(b)(2)(A), (K), and (M).

## I.

Diaconx is a closely held corporation which, prior to its bankruptcy filing, was a franchisee of and traded under the name of Computerland of Paoli. William R. Lidle ("Lidle") is the president and majority share holder of the corporation. After its incorporation in 1979, Diaconx was engaged in the business of retail sales of computers and related items and services. At its height, the corporation operated four stores. Since the filing of the bankruptcy all of the stores have closed.

In April 1984, Diaconx entered into two agreements with Hamilton to provide financing for the business: a commercial loan note ("note") in an original amount of $300,000.00 and a line of credit agreement ("line of credit") of $700,000.00. In connection with these credit agreements, Diaconx granted Hamilton a first lien in all of the corporation's inventory, equipment, accounts receivable, contract rights, machinery, furniture, fixtures, chattel paper, general intangibles, after acquired property and cash and noncash proceeds.

Also, Lidle executed a written guaranty of the corporation's indebtedness to Hamilton in the amount of $400,000.00, plus interest. The guaranty contained a confession of judgment clause upon default and acknowledged that Lidle and his wife had executed a collateral mortgage in favor of Hamilton as security for the guaranty. The mortgage, in the amount of $400,-000.00, encumbers the Lidles' real property located at 223 109th Street, Stone Harbor, N.J. The Lidles also own residential property in Paoli, Pennsylvania. Lidle testified that Stone Harbor property has a fair market value of $120,000.00 to $130,000.00 and that Hamilton's mortgage is junior only to a mortgage in the amount of approximately $16,000.00. Lidle further testified that the Paoli property is worth between $160,-000.00 and $165,000.00 and that it is subject to a senior mortgage of $53,000.00.

On January 13, 1986, Diaconx filed a voluntary petition under chapter 11 of the Bankruptcy Code. On February 19, 1986, Diaconx filed a statement of financial affairs and schedules disclosing bank deposits, office equipment, machinery and fixtures, inventory, accounts receivable and an entitlement to a tax refund with a total value of $1,032,995.00. Shortly after Diaconx's chapter 11 filing, Diaconx and Hamilton entered into a stipulation, covering the subsequent ninety (90) day period to allow Diaconx the use of cash collateral. The stipulation, dated January 24, 1986, was approved by this court on January 30, 1986. The stipulation also included provisions: (a) acknowledging that, at the time the bankruptcy was filed, Diaconx's indebtedness on the line of credit was $638,269.31 (of which $614,600.00 was denoted as principal) and that its indebtedness on the note was $257,-843.94 (of which $246,500.00 was denoted ask principal), which amounted to a total indebtedness of $896,113.25; (b) conditioning the use of cash collateral on a schedule of payments to Hamilton by Diaconx; (c) requiring Diaconx to deposit all proceeds of bank accounts, cash, checks and other cash equivalents in Hamilton and prohibiting the establishment or use of any other depository facility; and (d) requiring Hamilton to forbear from enforcing its rights against Mr. and Mrs. Lidle until the earlier of October 1, 1986 or the date upon which all prepetition collateral has been liquidated, applied to the indebtedness and found to be insufficient to satisfy the indebtedness. A second cash collateral stipulation was read into the record in open court on May 8, 1986 and submitted in written stipulation form dated June 19, 1986. The second stipulation modified the first in certain respects not relevant here and otherwise extended it through June 30, 1986.

Pursuant to the cash collateral stipulations, Diaconx made payments to Hamilton totalling approximately $719,000.00. As a result, the note was paid in full. The balance due under the line of credit is approximately $203,000.00.

The record reflects that Diaconx complied with its obligations under the two cash collateral stipulations. It would ordinarily be expected that in light of the debtor's compliance and its substantial pay-

ments, the bank and the debtor would have maintained a cooperative relationship. For reasons which are not altogether clear, however, a serious rift developed between Diaconx and Hamilton in their business dealings. Hamilton has apparently insisted on strict satisfaction of its legal claims. The parties' disputes have resulted in substantial litigation.

On June 13, 1986, Diaconx instituted an adversary proceeding against Hamilton and certain Hamilton employees by filing a complaint entitled "complaint to determine secured status and for damages resulting from breach of financing agreement, economic duress, business coercion, interference with contractual relations, fraud and punitive damages." Lidle joined as a plaintiff in the complaint. The first three counts of the complaint each requested compensatory damages on behalf of Diaconx in the amount of $6.9 million and punitive damages of $12 million. The fourth count, entitled "determination of secured status—set off" requested damages of in excess of $19 million.[3] Because the plaintiffs sought a jury trial, the matter was transferred to the district court. In the district court, Lidle was dismissed as a party for lack of jurisdiction. *See In re Diaconx Corp.*, 65 B.R. 139 (E.D.Pa.1986). In September 1986, after a jury trial, a verdict was entered against Diaconx and in favor of Hamilton. Posttrial motions are presently pending. The district court, however, has required debtor to order and purchase the trial transcript in order to prosecute the posttrial motions. The estimated cost of the transcript is $1,763.00.

In connection with the various legal proceedings, Hamilton has expended signifi-

cant sums for legal expenses. Hamilton's witness testified that the bank paid approximately $120,000.00 in attorney's fees, largely in connection with the district court litigation. An additional $9,300.00 (approximately) was spent on costs as well as $16,000.00 in expert witness fees. If the legal expenses are added to Diaconx's present indebtedness for principal and interest, the total indebtedness is approximately $350,000.00.

The current assets of Diaconx consist of (1) inventory ($64,000.00 value); (2) accounts receivable ($18,000.00 value); (3) furniture, fixtures, fixtures in storage, equipment ($20,000.00 value), an oscilloscope ($1,500.00 value) and a preference action against ITT (in which the amount sought is $43,199.06). These values are derived from the operating reports filed by Diaconx as well as testimony offered by Mr. Lidle. Taking into account the contingent nature of the preference action, I find the present value of Diaconx's current assets to be $110,000.00.[4]

In accordance with its rights under the cash collateral stipulations, Hamilton has also moved to enforce the guaranty given on the corporate debt. In November 1986, Hamilton entered judgment by confession against Lidle and his wife in the Court of Common Pleas, Chester County, PA in the amount of $406,000.00. Mr. and Mrs Lidle have filed a petition to strike or in the alternative open the confessed judgment.[5]

## II.

The foregoing recitation illustrates that while the present dispute arises in the context of a cash collateral determination, it is only one phase of a bitter struggle between

---

**3.** The last count of the complaint requested $19 million on behalf of the individual plaintiff, Lidle.

**4.** Lidle testified that the inventory figure, which is derived from Diaconx's operating statements filed with this court, was too low. He stated that its value might be at least 20% greater if marketed properly. However, he also conceded that there would also be costs associated with the marketing. When these costs are considered, any increase in value is minimal.

**5.** In a separate adversary proceeding, the debtor has requested that the bankruptcy court exercise its equitable powers under 11 U.S.C. § 105 to enjoin prosecution of the state court guaranty proceedings against Mr. and Mrs. Lidle. In a separate opinion and order, I have denied that request. *In Diaconx*, 69 B.R. 343 (Bankr.E.D. Pa.1987).

Diaconx and Hamilton. From Hamilton's point of view: it is a secured creditor; it allowed the debtor to use cash collateral upon certain conditions; it had consented to the use of cash collateral and had been paid in accordance with its stipulation with the debtor; it no longer agrees to the use of cash collateral because it believes that its interest is not presently adequately protected; and, to add insult to injury, Diaconx seeks court permission to use bank collateral to fund litigation against the bank. From Diaconx's point of view: it paid approximately 80% of its indebtedness to Hamilton during the initial months of its bankruptcy; its business reversals allegedly were caused by a business tort perpetuated by Hamilton; under its legal theories, it owes no secured debt to Hamilton and, if it can eventually prevail in the district court litigation, it holds a claim against Hamilton far in excess of its indebtedness to Hamilton; and even assuming that Hamilton holds a secured claim, the claim is adequately protected by Diaconx's assets and the Lidle guaranty.

The parties' arguments, quite naturally, are colored by their strong sentiments in this matter. For clarity's sake, I will first set forth below my analysis of the key issues in this case. Since my conclusions are at odds with Diaconx's contentions, I will then explain why I have rejected its arguments.

■ The use of funds on account to pay for the district court transcript would constitute the use of cash collateral as defined in 11 U.S.C. § 363(a). Section 363(c)(2) provides that the debtor in possession may not use cash collateral unless the secured party consents or the court, after notice and hearing, authorizes such use. Section 363(e) further provides:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or

lease as is necessary to provide adequate protection of such interest.

The burden of proof on the issue of adequate protection falls upon Diaconx. *See* 11 U.S.C. § 363(*o*)(1).

The thrust of Hamilton's complaint is that it will be harmed if Diaconx is allowed to expend funds in which Hamilton holds a security interest to pay for the transcripts because Hamilton's interest is not adequately protected. I agree.

■ Based on the testimony, I have found that the present value of Diaconx's current assets is approximately $110,-000.00. The unpaid balance due on Hamilton's claim is approximately $203,000.00. Thus, Diaconx's assets are insufficient by approximately $93,000.00 to pay the Hamilton claim. This insufficiency, or lack of equity, is a basis for concluding that Hamilton's claim is not adequately protected. *See, e.g., In re Ram Manufacturing, Inc.,* 32 B.R. 969 (Bankr.E.D.Pa.1983), *reconsideration denied,* 36 B.R. 822 (Bankr.E.D.Pa. 1984).

Diaconx asserts, however, that the Lidle guaranty provides Hamilton with adequate protection. According to Lidle's testimony, there is more than $200,000.00 in equity in the Stone Harbor and Paoli properties which protects Hamilton's interest. Hamilton counters by arguing that the right to pursue guarantors is insufficient to provide adequate protection under 11 U.S.C. §§ 361, 363 and that, in any event, the Lidles' dispute of the guaranty, through their petition to open or strike the confessed judgment, undercuts Diaconx's argument.

■ As Hamilton points out, there appear to be cases which state that the right to enforce a claim against a guarantor does not constitute adequate protection. *In re C.F. Simonin's Sons, Inc.,* 28 B.R. 707 (Bankr.E.D.N.C.1983); *In re Kenny Kar Leasing, Inc.,* 5 B.R. 304 (Bankr.C.D.Cal. 1980). However, the legislative history expressly refers to guaranties as a basis for providing adequate protection. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 340

(1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Particularly when a guaranty is secured, it may be a component of an adequate protection package. *In re Greenwood Building Supply, Inc.*, 23 B.R. 720 (Bankr.W.D.Mo.1982); *In re Earth Lite, Inc.*, 9 B.R. 440 (Bankr.M.D.Fla.1981); *accord, In re Mary Harpley Builder, Inc.*, 44 B.R. 151 (Bankr.N.D.Ohio 1984) (dictum). Other factors may also permit a finding that even an unsecured guaranty constitutes adequate protection. *See Commonwealth of Pennsylvania State Employees Retirement Fund v. Roane*, 14 B.R. 542 (E.D.Pa.1981) (federal mortgage guaranty can constitute adequate protection).

■ In this case, the Lidles' personal guaranty is secured by liens on two properties. However, the value of the guaranty is diminished by two factors. First, all of the evidence on value and prior encumbrances was derived from Lidle's testimony. While I do not question his honesty, Lidle is not the best qualified witness on these issues.[6] Second, Hamilton does have some uncertainty and will undoubtedly incur expense in enforcing the guaranty in light of the Lidles' opposition in state court. *See In re Harrow Leasing Corp.*,

35 B.R. 916 (Bankr.E.D.Pa.1983).[7] For these reasons, I will discount the claimed equity in the properties by a factor of 60%. This provides additional security to Hamilton with a value of approximately $80,000.00. Even taking the guaranty into account, Hamilton's interest is still not adequately protected.

■ Even were I to give Diaconx the benefit of my doubts and assign a somewhat higher value to the guaranty, Diaconx still could not prevail for, in the foregoing analysis, I have not considered Hamilton's claim for counsel fees and costs. The security agreement relating to the line of credit provides:

> In the event this Promissory Note is placed in the hands of an attorney or attorneys for the enforcement of any obligation set forth herein, Borrower agrees to pay, in addition to principal and interest, reasonable costs of collection including reasonable attorney's fees up to the percentage stated below.[8]

Assuming an unpaid balance of approximately $200,000.00, Hamilton's claim is secured by at least an additional $30,000.00 in counsel fees and $25,000.00 in costs arising largely in the district court litigation.[9] *See*

---

6. Not only is the only evidence on valuation derived from a source who is not an expert, the entire notion of valuation is inexact and imprecise. *In re Mikole Developers, Inc.*, 14 B.R. 524, 526 (Bankr.E.D.Pa.1981); *In re Tucker*, 5 B.R. 180, 182 (Bankr.S.D.N.Y.1980). Some margin for error must be considered. *In re LeMay*, 18 B.R. 659, 661 (Bankr.D.Mass.1982).

7. In *Harrow Leasing*, there was a dispute over the scope of guarantor's liability for the interest due on the loans in question. The court reasoned that the debtor's belief that its interpretation of the guaranty, as including liability for interest, would prevail was insufficient: "we find it dispositive, for purposes of determining whether the secured lenders' interests are adequately protected, that a controversy over the interpretation of said guaranty exists." 35 B.R. at 922. The dispute over the guaranty in state court in this case differs in that the Lidles do not appear to challenge that the scope of their liability is equal to that of Diaconx (up to $400,000.00). However, the Lidles do challenge the extent of the debt, in part on the same grounds as raised in the federal district court litigation, and seek to stay enforcement of the guaranty until there is a final, nonappealable decision in

the federal case. They have already obtained a stay of the state proceedings from the state court. Thus, notwithstanding the distinction between this case and *Harrow Leasing*, the value of the Lidle guaranty must be discounted.

8. "Stated below" in the security agreement is a confession of judgment clause that authorizes a counsel fee of 15% of the amounts unpaid on the promissory note.

9. Hamilton's position is that it is entitled to the full $120,000.00 it claims to have incurred in attorney's fees. In its itemization of damages filed in connection with its state court confessed judgment, Hamilton listed almost $119,000.00 in counsel fees as damages. Also included in the itemization were amounts for the principal balance, accrued interest and various costs. The sum total of the itemization was approximately $353,000.00. Hamilton then added an additional 15% over and above the $353,000.00 as attorney's fees pursuant to the line of credit note. In light of my disposition of this case, I need not pass on the validity of Hamilton's calculation. *See generally In re Cosby*, 33 B.R. 949 (Bankr.E.D.Pa.1983); *In re Roberts*, 20 B.R. 914, 920–21 (Bankr.E.D.N.Y.1982).

*Matter of M.S. Wien & Co.,* 54 B.R. 183, 185–56 (Bankr.D.N.J.1985) (holding that a creditor's attorney's fees incurred in defending an action are part of collection costs as they were necessary "in defending its right to monies claimed from the debtor"). Particularly when I take into account the attorney's fees and costs, the value of the Diaconx assets and the personal guaranty are insufficient to protect Hamilton's interest.

■ For these reasons, I conclude that Hamilton's interest in cash collateral will not be adequately protected if Diaconx is given permission to expend funds to purchase the district court transcript. *See In re Ram Manufacturing, Inc.* (request for use of cash collateral denied due to lack of sufficient equity cushion to protect secured creditor's interest). *See also In re Certified Corp.,* 51 B.R. 768 (Bankr.D.Hawaii 1985) (use of cash collateral conditioned upon grant of additional collateral due to lack of equity in existing collateral); *In re Harrington & Richardson, Inc.,* 48 B.R. 431 (Bankr.D.Mass.1985) (use of cash collateral permitted for limited period due to existence of small equity cushion).[10]

### III.

Diaconx makes three additional arguments in support of its request for permission to expend estate funds for the purchase of the district court transcript. The thrust of each argument is that Hamilton's claim is now unsecured and therefore Diaconx's cash on account does not constitute cash collateral. These arguments are without merit.

■ The first argument can be easily dismissed. At trial, Lidle testified that the commercial loan note and the line of credit note (Exhibits "P–11" and "P–12") were altered after he signed them on behalf of Diaconx. In particular, he claimed that when he signed the documents, neither included a reference to the security documents which created security interests in favor of Hamilton in Diaconx's accounts receivable, inventory and equipment. At trial, Diaconx argued that the alleged alteration of the notes impairs the validity of the security agreements. However, Lidle never disputed that, on behalf of Diaconx, he signed the security agreements; nor did he suggest that the security agreements were altered. The contemporaneous, or at least near contemporaneous, execution of the notes and security agreements, and the parties' subsequent conduct leaves no doubt in my mind that the parties intended to create the security interests at issue and that the formal requisites of 13 Pa.C.S. § 9303(a) have been established. *See, e.g., Ledford v. Thorp Financial Services,* 52 B.R. 45 (Bankr.S.D.Ohio 1985); *In re Mid-Atlantic Piping Products of Charlotte, Inc.,* 24 B.R. 314 (Bankr.W.D.N.C.1982); *E–B Grain Co. v. Denton,* 73 N.C.App. 14, 40 UCC Rep.Serv. 1119, 325 S.E.2d 522 (1985), *review denied,* 313 N.C. 598, 330 S.E.2d 608 (1985). Accordingly, I reject Diaconx's attack on the validity of the security agreements.[11]

■ At trial, Diaconx also went to great lengths to show that, prior to bankruptcy, Hamilton had "written off" a substantial portion of Diaconx's indebtedness, bringing the debt down to approximately $365,000.00. Diaconx suggested that only the portion of the debt that had not been written off remained secured and that since Hamilton has received in excess of that

---

10. Even a slim equity cushion may not be sufficient to provide adequate protection. *See In re Liona Corporation,* 68 B.R. 761 (Bankr.E.D.Pa. 1987).

11. Perhaps unaware of its significance, Diaconx also stipulated to the following fact:
   [Hamilton] holds a first lien, perfected, prepetition and post-petition security interest in, inter alia, [Diaconx's] inventory, equipment, accounts receivable, contract rights, machin-

ery, furniture, fixtures, chattel paper, general intangibles, wherever located, plus after acquired of the above, plus cash and non-cash proceeds.

This fact would also support my finding that the security agreements are valid, as would Diaconx's entry into the first cash collateral stipulation which contains a provision granting Hamilton "a first lien and security interest" in the subjects assets. (Exhibit "P–6," ¶ 5(a)).

amount, post-bankruptcy, the security interest has been satisfied. Diaconx contended that this analysis was mandated by "accounting principles."

After advancing this argument, Diaconx produced no evidence supporting its "accounting principles" theory. Perhaps more important, Diaconx has not cited any legal authority explaining why the unilateral action of a bank's accounting department in writing off a debt as uncollectible internally on its books affects the legal rights of the bank and its obligor. Indeed, in this case, the security agreements expressly provide that they "may be modified, amended or waived only in writing signed by the Bank." (Exhibit "P–5," ¶ 7). Absent a subsequent agreement of the parties in the nature of an accord and satisfaction or a novation, I can only conclude that the original security agreement has remained in effect. *See generally Buttonwood Farms, Inc. v. Carson*, 329 Pa.Super. 312, 478 A.2d 484 (1984), *citing Yoder v. T.F. Scholes, Inc.*, 404 Pa. 242, 173 A.2d 120 (1961). In this case, the record could not possibly support a finding of a later agreement in which the parties intended to displace and extinguish the April 1984 security agreements. Indeed, at the time the debt was partially written off, the debtor was not even aware that Hamilton had done so. In short, there has been no subsequent agreement between the parties which has impaired the original security agreements. For these reasons, I am totally unpersuaded by Diaconx's argument. *See also International Election Systems Corp. v. Shoup*, 452 F.Supp. 684, 689–90 (E.D.Pa.1978), *aff'd*, 595 F.2d 1212 (3d Cir. 1979); *Ampex Corp. v. Appel Media, Inc.*, 374 F.Supp. 1114 (W.D.Pa.1974).

Diaconx's last argument is based on 11 U.S.C. § 506(b) which provides:

> To the extent that an allowed secured claim is secured by property, the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

Diaconx contends that Hamilton's claim was undersecured at the time the bankruptcy was filed.[12] Therefore, according to Diaconx, Hamilton is not entitled to post-petition interest or costs. Depending upon the precise valuation, as of the filing of this bankruptcy, of the secured property, Diaconx submits that the payments it has made to Hamilton have either paid off the secured claim in its entirety or at least reduced the claim to a level at which it is adequately protected by the remaining corporate assets and the Lidle guaranty.[13] For several reasons, Diaconx's argument fails.

Initially, I find it troubling that Diaconx would raise this issue for the first time at this stage of these bankruptcy proceedings. At no point in this case did the debtor request a determination of Hamilton's secured status *under section 506* as is authorized by Bankr.Rule 3012. To the contrary, it appears that, at all relevant times, the parties acted under the assumption that Hamilton's claim was fully secured. In reaching this conclusion, I am influenced by the parties' entry into the two cash collateral stipulations. These agreements set forth, in significant detail, the respective rights and obligations of the parties.

---

**12.** The parties have assumed that the relevant date for valuation purposes under 11 U.S.C. § 506(b) is the date of commencement of the bankruptcy case. *Accord,* 3 Collier on Bankruptcy ¶ 506.04[2], at 506–36 to 506–38 (15th ed. 1986).

**13.** Since the payments were made in connection with a cash collateral agreement designed to provide Hamilton with adequate protection, *see* 11 U.S.C. § 363(c)(2), (e), Diaconx's argument assumes that an undersecured creditor is not entitled to periodic interest payments as a component of adequate protection. *Compare, e.g., In re Timbers of Inwood Forest Associates, Ltd.*, 793 F.2d 1380, *rehearing granted en banc* 802 F.2d 777 (5th Cir.1986) *with, e.g., In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir. 1984). In light of my disposition of this case, I need not reach this issue.

If either entity believed Hamilton to be undersecured or if there was any intention to limit Hamilton's rights, particularly with regard to the manner of applying payments received under the stipulations, the limitations would have been expressed therein.

Moreover, Diaconx's argument is based primarily on Lidle's testimony that the value of the assets securing Hamilton's claim was $844,000.00 at the time of the bankruptcy filing while the indebtedness was approximately $896,000.00. This testimony, however, is inconsistent with the disclosures made on Diaconx's bankruptcy schedules which indicated that Hamilton's claim was not undersecured.[14] In its complaint for a determination of Hamilton's secured status and for damages, which was filed in this court in June 1986 and tried before a jury in the district court, Diaconx reiterated the valuations set forth in the bankruptcy schedules.[15]

In his testimony, Lidle did not dispute the valuations previously admitted in the earlier filings. Rather, he appeared to be disputing that certain assets, primarily the $138,000.00 tax refund Diaconx was expecting on the date of its bankruptcy filing, were subject to Hamilton's security interest. In making that legal judgment, Lidle erred.

■■■■ The security agreements covering accounts receivable (Exhibits "P–4," "P–5") expressly state that the "collateral" securing the indebtedness includes "all present and future accounts ... contract rights and general intangibles in which [Diaconx] now has or may hereafter acquire an interest...." Under the UCC, the grant of a security interest in general intangibles is sufficient to cover tax refunds. *In re Metric Metals International, Inc.,* 20 B.R. 633 (S.D.N.Y.1981); *In re Scherbenske Excavating, Inc.,* 38 B.R. 84 (Bankr.D.N.D.1984); *Venn v. Finance America Corp.,* 19 B.R. 155 (Bankr.N.D. Fla.1982); *In re Kendrick & King Lumber, Inc.,* 14 B.R. 764 (Bankr.W.D.Okla. 1981). With the recognition that the expected tax refund was subject to Hamilton's security interest, there is no doubt that Hamilton's collateral was greater than the amount of its allowed secured claim, *see* 11 U.S.C. § 506(b), and therefore, Hamilton is entitled to postpetition interest and costs.[16]

■■■■ Finally, I note that even if Hamilton were undersecured when Diaconx filed its bankruptcy petition, it would not necessarily follow that Hamilton's interest is presently adequately protected. Diaconx's argument is that any insufficiency between the current value of Diaconx's assets and the unpaid balance of Hamilton's allowed secured claim would be protected by the Lidle guaranty. Diaconx appears to assume that any reduction in Hamilton's secured claim against Diaconx pursuant to 11 U.S.C. §§ 502(b)(2), 506(b) similarly reduces the obligation of the guarantors, Mr. and

---

**14.** Schedule B–2 discloses the following secured assets: (1) $250,000.00 on deposit with First Pennsylvania Bank; (2) various office equipment and fixtures worth $25,000.00; (3) computer hardware worth $374,995.00; (4) an entitlement to a tax refund of $138,000.00; and (5) accounts receivable of $245,000.00. These assets total $1,032,995.00, a sum in excess of the indebtedness to Hamilton.

**15.** In addition to the assets described in the schedules, paragraph 121 of the complaint lists as an asset three Computerland franchises worth $75,000.00 each. The debtor's interest in these franchises may also have been subject to Hamilton's security interest as a "general intangible." *See In re Hengalo Enterprises, Inc.,* 51 B.R. 54 (Bankr.S.D.Fla.1985). If so, this admission is further evidence that Hamilton was not

undersecured at the time this bankruptcy was filed.

**16.** The fact that Diaconx's $719,000.00 in payments to Hamilton were derived from the liquidation of the collateral (including the tax refund) and that the value of the collateral no longer exceeds the indebtedness is certainly some evidence that Hamilton may not have been fully secured at the time of the bankruptcy filing. However, it is also possible, for reasons which the parties did not see fit to fully explore at trial, that Hamilton was oversecured at the time of the bankruptcy filing and that the value of the collateral has since depreciated more quickly than it could be liquidated. It is also possible that various postpetition expenditures by Diaconx have reduced the amount of collateral remaining.

Mrs. Lidle. However, the scope of a guarantor's liability depends on the terms of the guaranty. If the terms of the contract so state, the guarantor may even assume a greater liability than that of the principal. *E.g., Paul Revere Protective Life Insurance Co. v. Weis,* 535 F.Supp. 379 (E.D.Pa. 1981), *aff'd,* 707 F.2d 1403 (3d Cir.1982). Specifically, a guarantor who unconditionally guarantees an indebtedness may be obliged to satisfy the debt in full even if the obligation of the principal is impaired in bankruptcy proceedings. *See Leasing Service Corp. v. Benson,* 30 D. & C.3d 84 (C.P.Phila.1982), *aff'd on other grounds,* 317 Pa.Super. 439, 464 A.2d 402 (1983). Thus, the Lidles' obligation may be unaffected by the application of 11 U.S.C. §§ 502(b)(2), 506(b) to the Diaconx indebtedness to Hamilton.[17] If so, the benefit of the guaranty would be significantly lessened. I need not make a precise determination in this case, however, since I have concluded that Diaconx's obligation to Hamilton is not subject to the limitations imposed by sections 502(b)(2) and 506(b).

### IV.

For the reasons set forth above, I shall deny Diaconx's motion for permission to expend estate funds and I shall grant a preliminary injunction to Hamilton prohibiting Diaconx's use of cash collateral.

---

**17.** Paragraph 4 of the guaranty executed in this case provides:

    4. UNCONDITIONAL LIABILITY—The liability of the Undersigned is absolute and unconditional and shall not be affected in any way by reason of ... any invalidity of, any delay in enforcement or any failure to enforce any rights ... against any person or persons, including the Principal Debtor an any of the Undersigned or in any property ...