**In re LIONA CORPORATION, N.V. Debtor.**

**Bankruptcy No. 86–05484F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 5, 1987.

Joseph A. Dworetzky, Drinker, Biddle and Reath, Philadelphia, Pa., for debtor, Liona Corporation N.V.

R. Dennis Faucher, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for Simon-Tye Associates and 135 Ventures, Inc.

Myron A. Bloom, Adelman, Lavine, Krasny, Gold & Levin, Philadelphia, Pa., for Mobiliaria Agricola y Financiera Interacional S.A.

## OPINION

BRUCE FOX, Bankruptcy Judge.

Before me is a motion for relief from the automatic stay filed by Simon-Tye Associates and 135 Ventures, Inc. (the movants). The debtor is Liona Corporation, N.V. (Liona), against whom an involuntary bankruptcy petition was filed by M.A.F.I.N.T., a Panamanian company. The Liona bankruptcy was filed on November 28, 1986. The movants then filed the motion for relief from stay, a motion to dismiss the involuntary petition and requested expedited consideration of the two motions. A hearing was held on December 18, 1986, at which time I granted the movant's request for expedited consideration of the motion for relief from stay and denied the request for expedited consideration of the motion to dismiss. A hearing was held on the motion for relief from stay on December 31, 1986 and January 2, 1987, which, at the debtor's request, was scheduled as a preliminary hearing pursuant to 11 U.S.C. § 362(e).

For the reasons set forth below, I conclude that there is no reasonable likelihood that the debtor will prevail at the final hearing and so the automatic stay will be lifted pending the final hearing. *See* 11 U.S.C. § 362(e).

### I.

The facts of this contested matter are somewhat complex and concern the Philadelphia Centre Hotel (the hotel). In September 1981, the hotel was owned by a partnership known as Simon Associates. In September 1981, all of the partnership interest in Simon Associates was sold to a group of investors which, after the sale, changed the name of the partnership to PCH Associates (PCH). The former partners, as part of the consideration, took back a mortgage under the names of Simon-Tye Associates and 135 Ventures, Inc., the movants herein. The sale was subject to two prior mortgages held by First Pennsylvania Bank, N.A. and Barclay's American Business Credit, Inc. PCH then sold the land underlying the hotel to Liona's predecessor which then "leased" the land back to PCH under a long term lease. Once Liona succeeded to its interest in the property, the end result was that Liona held title to the land and leased it back to PCH which owned and managed the hotel. The terms of the lease subordinate Liona's claims against the hotel to those of the three mortgage holders.

In August 1984, PCH ceased making mortgage payments and tax payments. In November 1984, PCH filed a voluntary petition under chapter 11 of the Bankruptcy Code in the bankruptcy unit of the United States District Court for the Southern District of New York (case no. 84 B 11540). PCH continued to operate the hotel until November 30, 1986, at which time the hotel was closed. It remains closed at the present time.

Litigation between PCH and Liona arose in the New York bankruptcy case after Liona sought to compel PCH to assume or

reject the lease under the provisions of 11 U.S.C. § 365(d)(3), (4). On October 27, 1986, the United States Court of Appeals for the Second Circuit affirmed the decision of the district court and the bankruptcy court and held that Liona and PCH did not enter into a bona fide lease subject to section 365(d)(3), (4). The court left undecided whether the parties had entered into "a joint venture, a security agreement, or some other form of investment vehicle." *In re PCH Associates*, 804 F.2d 193, 201 (2d Cir.1986).

Also in the New York bankruptcy proceedings, the movants filed a motion for relief from stay in December 1985. This matter was settled on January 8, 1986. Under the terms of the settlement, the movants were granted relief effective September 1, 1986 unless they were repaid in full prior to that date. When they were not paid by that date, movants confessed judgment against PCH in the Court of Common Pleas of Philadelphia County on September 2, 1986, in the amount of $6,399,143.60. They also scheduled both the hotel and the underlying land for a sheriff's sale in Philadelphia for December 1, 1986. PCH then sought relief in the New York bankruptcy court to overturn the effect of the January 1986 stipulation and stay the sheriff's sale. The bankruptcy court denied the request due its lateness, the lack of evidence of any likely sale of the hotel and the length of time the stay had already been in effect. The court noted, in its bench opinion, that a liquidating chapter 11 plan was contemplated and yet there had been no sale, nor any reasonable prospect of sale in almost two years. (Exhibit M–22, transcript of October 31, 1986).

Just before the December sheriff's sale was to take place, the Liona involuntary bankruptcy petition was filed and the sale date was postponed until January 5, 1987. If the sale does not take place at that time, no sheriff's sale can take place prior to April 6, 1987.

## II.

At the preliminary hearing in this matter, the movants presented certain evidence which was not contradicted. There had been no payments to any of the mortgage holders or taxing authorities since August 1984. First Pennsylvania Bank, as of December 31, 1986, was owed $7,164,054.51 on principal, interest and late charges. Barclay's was owed $2,597,526.44 as of December 31, 1986 for principal, interest and various costs and fees. Unpaid real estate taxes totalled $1,749,866.91. Furthermore, 1987 real estate taxes which are assessed in January 1987 and due not later than March 31, 1987 will be $447,762.50. Of course, interest and penalties will continue to accrue on the delinquent taxes. Interest and penalties on the 1986 taxes alone totalled approximately $60,000 from March 1986 through December 1986. (Exhibit M–15).

■ Much of the testimony at the hearing focused on the value of the hotel and the underlying land. Both the debtor and the movants provided expert testimony from well-qualified, experienced commercial real estate appraisers. The movants' expert had done a detailed appraisal report in December 1985 and concluded that the hotel's fair market value, at that time, was $18,150,000 and that the value remained approximately the same as of December 31, 1986. This valuation was based upon a "highest and best use" approach for the real estate. This best use, according to the movants' expert, was to demolish the hotel and build an office building on the site. He reached his conclusion that the property had not appreciated since December 1985 based on a a variety of considerations. Among the factors which he felt tended to depress the value of the property were that: buyers in the real estate economy are now less optimistic; the office building market is less favorable as there is a possibility of an oversupply of office space in center city Philadelphia; the recently enacted federal tax reform legislation had generally depressed real estate values (although there was insufficient market data to quantify this factor); and the hotel had closed. He concluded that these factors were bal-

anced by a modest inflationary effect and a reduction in commercial interest rates. Based on all these considerations, his opinion was that the value of the property was about the same as a year ago.

The debtor's expert agreed largely with the movants' expert's valuation approach and, in particular, the conclusion as to fair market value in December 1985. However, he believed that the property had appreciated substantially in the succeeding twelve months and was now worth $22,000,000 with a potential high of $25,000,000. He gave a range of value because he felt the price the property would bring would depend on the identity and motivation of the purchaser. If the purchaser were prepared to begin redevelopment of the property immediately, it would likely bring a price at the higher end of his range. However, he conceded that it was likely that the purchaser would not be so prepared. He differed from the other expert primarily in the weight he gave to the unique nature of the property (in terms of its size and center city location), what he considered to be the continuing dynamic quality of the Philadelphia commercial real estate market and the trend of falling interest rates. The debtor's expert also felt that the other expert had given insufficient consideration to sales of (what the debtor's expert considered to be) comparable properties in 1986 and the hotel's ability to generate an income stream during a period of interim use before redevelopment.

It was quite apparent from the testimony that appraising a large commercial piece of real estate is not an exact science. *See In re Mikole Developers, Inc.*, 14 B.R. 524, 526 (Bankr.E.D.Pa.1981). Indeed, the movants' appraiser conceded that his valuation had a range of plus or minus $1 million. After considering the testimony of the experts, an experienced certified public accountant regarding the effect of the recent amendments to the tax code on commercial real estate values and one of the principals of the movants, I conclude that the fair market value of the hotel and undelying land will most likely be shown to be approximately $19,500,000 at the final hearing.[1] Moreover, I conclude that the personalty located in the hotel, which is also collateral for the debt owed the movants, will be shown to be approximately $300,000 at the final hearing.

Insofar as the value of the realty is concerned, I believe that the debtor's expert, who is not based in this region, failed to sufficiently take into account the current market for commercial office space in Philadelphia and the dampening effect the recent tax law changes might have on the market; he also overemphasized the "interim use" income which might be obtained from the property. At the same time, the decline in interest rates and the prime location of the hotel convince me that the movant's expert underrated the realty to some degree.

### III.

Having established the property values which are reasonably likely to be proven at the final hearing, I turn now to the arguments of the respective parties.

The debtor argues that at the final hearing, it will be able to prove that the movants' claim, which is based upon an unchallenged judgment lien, is overstated. The debtor argues that the September 1981 transactions involving the movant, PCH and Liona were a fraudulent conveyance under Pennsylvania law. However, no evidence was produced at the preliminary hearing on this matter and I must conclude that it is unlikely that the debtor will be able to present sufficient evidence to substantiate its position.[2]

---

1. Coincidentally, approximately the same valuation was suggested to the New York bankruptcy court by PCH's attorney at a hearing on October 27, 1986. (Exhibit M–21, N.T. 19). This representation had no effect on my determination in this case.

2. This assumes that such evidence would be relevant in conection with a motion for relief from stay. *See In re Gellert,* 55 B.R. 970, 974–75 (Bankr.D.N.H.1985).

■ Although the debtor did not establish that it is likely to substantially reduce the secured claims against the hotel property (other than through a challenge to the post-judgment interest rate on the movants' claim), I agree with the debtor that the movants are not entitled to relief from stay under 11 U.S.C. 362(d)(2). At a final hearing, the movants are unlikely to meet their burden of showing that there is no equity in the collateral.

For purposes of applying 11 U.S.C. 362(d)(2)(A), the concept of equity refers to the "difference between the property value and the total amount of liens against it." *E.g., In re Jug End in the Berkshires, Inc.,* 46 B.R. 892, 901 (Bankr.D.Mass.1985). The movants have the burden of establishing the lack of equity. 11 U.S.C. § 362(g)(1).

As I noted above, as of December 31, 1986, the likely value of the hotel was $19,500,000. The sum of all secured claims, including the tax liens, as of that date totalled $18,036,820.66.[3] I have computed the secured claims as follows:

| | |
|---|---|
| First Pennsylvania | $7,164,054.51 |
| Barclay | 2,597,526.44 |
| movants | 6,525,372.80 [4] |
| tax liens | 1,749,866.91 |
| total | $18,036,820.66 |

Based upon these calculations, it seems likely that at a final hearing, the movants will not sustain their burden and that equity, within the meaning of section 362(d)(2)(A), is likely to exist. Thus, I need not reach the question whether the hotel is needed for the debtor's reorganization under section 362(d)(2)(B). *See Ukrainian Savings and Loan Association v. Trident Corp.,* 22 B.R. 491, 493 (E.D.Pa.1982).

While the movants possess the burden of proof on the issue of equity, the debtor has the burden of proving that the movants are adequately protected for purposes of determining issues raised by section 362(d)(1). 11 U.S.C. § 362(g)(2); *accord, e.g., Matter of Schaller,* 27 B.R. 959 (W.D.Wisc.1983). For the following reasons, I believe that the debtor is unlikely to sustain its burden at a final hearing.

■ It is the responsibility of the debtor to propose adequate protection for the movants; it is not for the court to impose adequate protection. 2 Collier on Bankruptcy ¶ 360.01[2], at 361–8 (15th ed. 1986). Throughout this proceeding, the debtor has only suggested one method by which the movants may be adequately protected—the existence of an "equity cushion."[5] Nei-

3. In some cases, it may be of some significance whether the property is valued as of the date the petition was filed or whether it is valued as of the date the motion for relief was filed. One commentator has suggested that different valuation dates be utilized when applying sections 362(d)(1) and 362(d)(2). Fortgang and Mayer, *Valuation in Bankruptcy,* 32 U.C.L.A.L.Rev. 1061, 1070 n. 41 (1985). In the matter at hand, the motion was filed only a few weeks after the bankruptcy petition and the valuation analysis would be the same. Therefore, I do not reach the issue.

4. *See* Exhibit M–11. Movants presented documentary evidence that their secured claim, as of December 31, 1986, totalled $6,651,602.96. This claim consists of the confessed judgment of $6,399,163.60, plus interest from the date of judgment at 12% totalling $252,459.36. Although not expressly raised by the debtor, I believe that the postjudgment interest is likely to be proven to be overstated at a final hearing. Under Pennsylvania law, postjudgment interest runs at 6%. *See* 42 Pa.C.S. § 8101; 41 P.S. § 202. The note between the parties refers to a

default rate of 12% but is silent as to any postjudgment rate. Thus, the movants' interest and per diem computations are twice the legally valid rate. Postjudgment interest as of December 31, 1986 should be $126,299.20 with a per diem rate of $1,051.91. Since I conclude that the movants are oversecured, I need not reach the issue posed by *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984). *See generally In re Colrud,* 45 B.R. 169, 180 n. 14 (Bankr.D.Alaska 1984); *In re Morrissey,* 37 B.R. 571 (Bankr.E.D.Va.1984).

5. On November 25, 1986, PCH attempted to obtain a stay of the then impending foreclosure sale from the bankruptcy court in New York by offering to have the property sold free and clear of liens under 11 U.S.C. § 363(f) by bankruptcy sale in March 1987. To protect the third mortgagee in the interim, PCH proposed to pay $100,000. (*See* Exhibit M–23). Judge Blackshear denied the motion noting that there could be potential problems in consummating the sale under section 363(f) and that the delay would increase the claims of the tax liens and first and

ther periodic cash payments nor replacement liens were offered, *see* 11 U.S.C. 361(1), (2), although movants' counsel stated that periodic cash payments equal to the per diem rate for the three mortgages, plus payment of the 1987 real estate taxes would protect the movants' interests.

■ An equity cushion has been defined as "the surplus of value remaining after the amount of indebtedness is subtracted from the fair market value of the collateral." *Commonwealth of Pennsylvania State Employees Retirement Fund v. Roane,* 14 B.R. 542, 545 (Bankr.E.D.Pa. 1981).[6] In making this calculation, the court compares the value of the property to the sum of the movant's secured claim and those secured claims senior to that of the movant. *E.g., In re Jug End in the Berkshires, Inc.,* 46 B.R. at 901.

■ As the debtor notes, and I agree, in certain circumstances, an equity cushion by itself can constitute adequate protection within the meaning of section 362(d)(1). *See, e.g., In re Mellor,* 734 F.2d 1396, 1400 (9th Cir.1984); *In re Grundstrom,* 14 B.R. 791, 793 (Bankr.D.Mass.1981) & cases cited therein. However, the existence of an equity cushion, by itself does not always adequately protect the interest of a secured creditor. Various factors must also be considered. Among them are: the size of the equity cushion (sometimes expressed as a percentage of fair market value); the rate at which the cushion will be eroded; whether periodic payments are to be made to prevent or mitigate the erosion of the cushion; and, if the property is to be liquidated, the likelihood of a reasonably prompt sale. *See e.g., Ukrainian Savings and Loan Association v. Trident Corp.; Matter of Schaller; In re Grundstrom.*

■ As noted above, the conclusion that an equity cushion exists is "based upon approximations founded upon opinions and assumptions." *In re Tucker,* 5 B.R. 180, 182 (Bankr.S.D.N.Y.1980). To the extent the cushion is small, it may not be sufficient to constitute adequate protection:

A seven percent equity cushion will rarely provide sufficient protection because a key component of the ratio, the fair market value figure, is only the court's best estimate and, as an estimate, requires a margin for error.

*In re Lemay,* 18 B.R. 659, 661 (Bankr.D. Mass.1982).

■ To the extent there is a slim equity cushion which is eroding rapidly, the interests of the secured creditor may not be adequately protected. *See Ukrainian Savings and Loan Association v. Trident Corp.; Matter of Schaller; In re Jug End in the Berkshires, Inc.* In the instant case, the equity cushion is a slim 8.9%.[7] The cushion will diminish rapidly, at a rate of approximately $120,000 per month[8] plus

second mortgages to the potential detriment of the third mortgagee.

Here, Liona offered to permit a bankruptcy sale in mid-February 1987 as adequate protection but only in the event it did not succeed at the final hearing on the movants' motion for relief. It made no offer of any funds to be paid to any of the mortgagees or to the taxing authorities during the period of delay. It did not explain who will pay the marketing costs for the sale. Also I am not convinced that all interested parties will necessarily consent under section 363 so as to permit a prompt sale. As Judge Blackshear earlier concluded, this offer does not adequately protect the interests of the third mortgagee. In fact, it is less attractive than the PCH offer which the bankruptcy court in New York rejected.

6. While the concept of equity differs between section 362(d)(1) and (d)(2), *see Matter of Mel-*

*lor,* 734 F.2d 1396, 1400–01 (9th Cir.1984), the two concepts merge partially when one considers the interest of the most junior secured creditor. I do not decide in this case the nature of Liona's interest in the hotel or, in particular, whether Liona is a secured creditor of PCH.

7. Considering the value of the personalty as well as the realty, the cushion is ($19,800,000 minus $18,036,820.66) divided by $19,800,000.

8. The per diem rate of the three mortgages totals $3,723.87. In addition, interest and penalties for unpaid 1986 taxes alone totalled $60,-000. It is safe to assume that tax penalties for unpaid 1984, 1985 and 1986 taxes will exceed $100,000 on an annual basis, which yields a per diem rate of $273.97. Thus, the total per diem is approximately $4,000 per day or $120,0000 per month.

the imposition of a tax lien for for the 1987 real estate taxes of $447,762.50, which will become due not later than March 31, 1987. Thus, in three months, which is the time period which will elapse before the hotel can be rescheduled for foreclosure sale, the $1,800,000 cushion will be eroded by more than $800,000. With proper deference for a margin of error in valuation, this cushion does not provide adequate protection.

 In addition, when the claims of secured creditors are to be paid by liquidating the collateral, the interest of those creditors may not be adequately protected if there is no likelihood of liquidation in the near future. *In re Grundstrom; In re Lemay.* Indeed, a key premise of the valuation opinion of the debtor's expert, whose testimony I have credited in part, is that the property could be both marketed adequately and sold promptly. However, PCH Associates has been unable or unwilling to sell the hotel since it filed for bankruptcy in November 1984. Liona offered no evidence to provide any assurance that it will achieve any greater success.

> The degree of protection afforded by an equity cushion must be determined upon supposition as to the future, with a view from the known probing the unknown. By virtue of § 362(g)(2), it is the defendant-debtor who has the burden of divining the future and proving the proffered protection adequate.

*In re Tucker*, 5 B.R. at 183.

For these reasons, the small equity cushion which is rapidly eroding without a prospect for a reasonably prompt sale of the hotel, I must conclude that the debtor will fail to meet its burden at a final hearing. *See Ukrainian Savings and Loan Association v. Trident Corp.* If the debtor had proposed to make periodic payments on the secured debt, its burden would have been met; *see In re Roane*, 14 B.R. at 545; however, the debtor refused to do so.

Therefore, effective immediately, the automatic stay will be lifted pending the final hearing in this matter.[9]

### ORDER

AND NOW, this 5th day of January 1987, after consideration of the evidence submitted at the preliminary hearing held pursuant to 11 U.S.C. § 362(e), it is hereby ORDERED that:

1. Simon-Tye Associates and 135 Ventures, Inc. (movants) are granted relief from the automatic stay pending the final hearing in this matter.

2. Pursuant to this order, movants may expose the property known as the Philadelphia Centre Hotel to the sheriff's sale in Philadelphia County scheduled for January 5, 1987.

3. A final hearing in this matter shall be held on January 15, 1987, at 10:00 A.M. in Bankruptcy Courtroom No. 1.

---

**9.** My conclusion that the movants are likely to prevail under section 362(d)(1) makes it unnecessary for me to reach their other arguments. For example, they argue that Liona should be treated as a party to the stipulation in New York granting the movants relief from the stay. They also argue that the debtor's failure to make mortgage payments by itself is "cause" under section 362(d)(1). *See In re Wright, Egan & Associates,* 60 B.R. 806 (Bankr.E.D.Pa.1986).