**In re SHARON STEEL CORPORATION, et al., Debtor.**

**SHARON STEEL CORPORATION, et al., Movants,**

v.

**CITIBANK, N.A., as Agent for the Lenders Listed on Exhibit "A," Respondents.**

**Bankruptcy Nos. 92–10958, 92–10959 and 92–10961. Motion No. PMS–9.**

United States Bankruptcy Court, W.D. Pennsylvania.

April 23, 1993.

Herbert P. Minkel, New York City, for debtor.

Stephen Karotkin, New York City and William H. Schorling, Pittsburgh, PA, for respondents.

James G. McLean, Pittsburgh, PA, for Mueller Industries, Inc.

Philip E. Beard, Pittsburgh, PA and Henry Weisberg, New York City, for Official Committee of Unsecured Creditors.

Leonard F. Spagnolo, Pittsburgh, PA, for Pension Benefit Guar. Corp.

Bruce Simon, New York City and James English, Pittsburgh, PA, for United Steelworkers of America.

Carla Brown Horn, Pittsburgh, PA, for Continental Bank.

Richard J. Parks, Erie, PA, for Integra Bank United States Trustee, Pittsburgh, PA.

*OPINION*[1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Presently before the Court is the motion of Sharon Steel Corporation, a Delaware corporation, Sharon Specialty Steel, Inc. and Monessen, Inc. (collectively, "Debtor") for an Order Granting Debtors-in-Possession Authority to Use Cash Collateral ("Motion"). Sharon Steel Corporation, a Pennsylvania corporation ("Old Sharon"), operated under Chapter 11 of the Bankruptcy Code from April 17, 1987 until confirmation of its plan of reorganization in December, 1990. As part of Old Sharon's plan of reorganization, the present Debtor was organized by investors affiliated with Castle Harlan, Inc. to acquire Old Sharon's steel operations.

To assist the Debtor in the acquisition, several financial institutions, with Citibank acting as agent (collectively, "Citibank"), entered into a credit agreement with the Debtor dated as of December 28, 1990 ("Credit Agreement"). The Credit Agreement provided the Debtor with a term loan and a revolving line of credit.

To secure its obligations under the Credit Agreement, the Debtor granted Citibank liens and security interests in substantially all of the Debtor's property including all accounts receivable and inventory.

In August, 1992, Mueller Industries, Inc. ("Mueller") loaned the Debtor $4.125 million. As security for its obligation to Mueller, the Debtor granted Mueller liens and security interests junior to Citibank in all of the Debtors' accounts receivable and inventory.

Both Citibank and Mueller (collectively, the "Lenders") oppose the Motion. A brief interim hearing was convened on December 2, 1992 at which it was determined that an evidentiary hearing was necessary. By Order of December 3, 1992, as amended on December 7, 1992, we authorized the Debtor's use of cash collateral for specific expenditures and fixed an emergency evidentiary hearing for December 8 and 9, 1992. Following two days of testimony on December 8 and 9, 1992, pertaining to the valuation of the collateral and the feasibility of the Debtor's proposed 18-week business plan, we determined that the value of the collateral was uncertain and that the Debtor's plan proposed on its face to continue operations at a loss. We refused to grant the Debtor authority to use cash collateral for the purpose of resuming operations based on that 18 week plan. We did authorize the interim use of cash collateral to maintain and preserve the Debtor's property and certain other expenditures. A final hearing on the Motion was fixed for February 3 and 4, 1993. After several extensions by agreement of the parties, a final hearing commenced on April 6, 1993. The Court heard three additional days of testimony. By the time of the final hearing, the Debtor had revised its plan and advocated start-up under its business plan dated 25 March 1993 (the "Business Plan").

After consideration of the evidence, the exhibits, arguments of counsel and the record, we now determine that it is inappropriate to authorize the Debtor to use cash collateral to resume operations on the basis requested.

### Factual Background

The Debtor borrowed some $60 million from Citibank to effect the acquisition from Old Sharon. The Debtor borrowed an additional $8 million from Citibank for equipment known as a "coil box." The Credit Agreement further provided the Debtor a revolving credit working capital facility of up to $52 million. The working capital facility is an asset-based facility on which loans are made pursuant to a formula based on the Debtor's level of eligible accounts receivable and eligible inventory which serve as collateral for the loans.

The Credit Agreement provides for Citibank to collect the Debtor's accounts receivable through a lock box. The Debtor could then draw on its revolving line of credit up to the maximum amount of $52

1. This Opinion constitutes this Court's findings of fact and conclusions of law.

million or the maximum amount fixed by the accounts receivable-inventory formula, whichever was lesser.

In addition to the debt to Citibank, the Debtor acquired from Old Sharon additional obligations to its employees and other creditors along with a need for new equipment. The Debtor contemplated that repayment to creditors and funds for capital expenditures would come from profits which it anticipated from operations, partially due to expected increases in the price of steel products. Unfortunately, steel prices not only failed to increase, but fell as the steel industry went into a downward cycle during 1991 and 1992. The Debtor found itself in financial straits soon after Old Sharon's prior bankruptcy had ended.

The Debtor experienced minimal profitability in 1991. Between May and August 1992, the Debtor suffered a tremendous loss—$33 million.

This loss included large write-downs in inventory and accounts receivable. If a portion of this loss were applied against 1991 when it most likely occurred, this Debtor's financial statements would reflect that the Debtor has continually operated at a loss since it commenced operations. The Debtor attempted to proceed with needed investments in new equipment. The Debtor met its debt service and capital expenditures by increases in borrowing and in accounts payable and by depleting capital.

An equity infusion was needed. The Debtor first pursued a public stock offering and later sought a private placement or a loan from new entities—none of which proved fruitful.

In mid–1992, the Debtor reached the maximum availability on its revolving line of credit. Sometime around June or July, 1992, Citibank did an investigation of accounts receivable and found that the Debtor had misrepresented its receivables and that upon elimination of the ineligible receivables from the collateral, the Debtor had over-borrowed and was in default under the Credit Agreement.

Part of the funds used to cover the Debtor's losses came from Mueller. A dispute with Mueller was settled in August, 1992 by Mueller making an immediate loan to the Debtor of $4.125 million.

As a result of the "overadvance" position in which the Debtor had placed Citibank, Citibank tightened the cash flow. Unable to continue its operation, the Debtor ceased manufacturing and laid off most of its employees by early November. The Debtor filed its voluntary Petition under Chapter 11 of the Bankruptcy Code on November 30, 1992 (the "Filing Date"). As of the Filing Date, the Debtor owed Citibank approximately $77 million with interest and fees continuing to accrue. The present debt is about $80 million. The Debtor owes Mueller approximately $4 million.

The Debtor seeks permission pursuant to 11 U.S.C. § 363 to use cash collateral, including proceeds from the sale of fixed assets, to resume operations. The Debtor asserts that the collateral securing the debt to the Lenders has a value far in excess of the obligations and thus, the Lenders are adequately protected by a substantial equity cushion.

Citibank acknowledges that it is oversecured but denies that it is adequately protected by an equity cushion. Citibank asserts that the assets upon which the Debtor relies in calculating the equity cushion are of insufficient value to constitute adequate protection for the use and possible dissipation of liquid assets.

Mueller maintains that the Debtor's use of cash collateral must be denied absent a showing that its collateral base will be stabilized and maintained at current levels.

*Discussion*

*Requirement of Adequate Protection*

11 U.S.C. § 363(c)(2) provides that the Debtor must obtain consent or court authorization prior to the use of cash collateral. 11 U.S.C. § 363(e) provides that the court shall prohibit or condition such use [of cash collateral] as is necessary to provide adequate protection of [the secured lender's] interest.

11 U.S.C. § 361 specifies four means of providing adequate protection:

§ 361.  Adequate protection.

When adequate protection is required under section 362, 363 or 365 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property;  or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

■ The purpose of providing "adequate protection" is to insure that a secured creditor receives in value essentially what he bargained for. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987); *H.R.Rep. No. 595*, 95th Cong., 1st Sess. 339 (1977), *reprinted in* 1978 *U.S.Code Cong. & Admin.News*, pp. 5787, 6295. The means of adequate protection provided by § 361 are not exclusive. *In re O'Connor*, 808 F.2d at 1397; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984). Exactly what constitutes adequate protection must be decided on a case by case basis. *In re O'Connor*, 808 F.2d at 1396–97.

■ The existence of an equity cushion alone can constitute adequate protection. *In re Mellor*, 734 F.2d 1396 (9th Cir.1984); *In re Lane*, 108 B.R. 6 (Bankr.D.Mass.1989) *and cases cited therein; In re Grant Broadcasting of Phila., Inc.*, 75

B.R. 819, 8234–24 (E.D.Pa.1987). We believe it improper to look at valuation of assets in a vacuum. While the present value of a debtor's assets may be sufficient to constitute adequate protection, a debtor's future operational plans may result in a rapid deterioration of the collateral. Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection. *See In re Liona Corp.*, 68 B.R. 761, 767 (Bankr.E.D.Pa.1987).

We view the issues in the present matter as: 1) Whether the value of the Debtor's assets exceed the amount of its secured obligations, thus providing an equity cushion for the Lenders, and 2) If an equity cushion exists, whether that equity cushion provides the Lenders with sufficient adequate protection to justify permitting the Debtor to recommence operations under its proposed one-year Business Plan.

*Equity Cushion*

The Lenders concede that they are oversecured. They deny, however, the existence of an equity cushion sufficient to constitute adequate protection to permit the Debtor's use of cash collateral to attempt to implement the Business Plan.

■ Citibank asserts that liquidation value is the appropriate yardstick by which to measure the value of the Debtor's assets. We agree.

Although the Debtor argues that resuming operations will eventually show a profit, the Debtor is currently not operating and has a history of significant losses. At best, any chance of reorganization is speculative. *See In re Ram Mfg., Inc.*, 32 B.R. 969 (Bankr.E.D.Pa.1983); *In re Harrington and Richardson, Inc.*, 48 B.R. 431 (Bankr.D.Mass.1985).

Therefore, any hope of recovery in excess of liquidation value from the Debtor's assets is minimal.

■ Numerous witnesses provided testimony regarding value. The secured Lender's witnesses asserted a lower value for each asset than the values propounded by

the Debtor's witnesses. We arrive at the following values.

| | Millions |
|---|---|
| Cash (approximate amount includes collections between March 25, 1993, the date of the Business Plan and the date of the hearing, April 6) | 21.6 |
| Accounts receivable—Debtor asserts a value of 22.0 million which the Lenders assert is unrealistic. We believe the receivables most likely collectable have been collected, and that the reserve taken by the Debtor will be insufficient. We reduce the value accordingly. | 15.0 |
| Inventory—Debtor asserts a value of 44.1 million, which includes supplies, molds, etc., which the Debtor admits are worth substantially less upon liquidation. We reduce the value accordingly. | 27.0 |
| Steel Division—assets located at Farrell, Pa.—Estimates of liquidation value range from $29 million by the Lender's witnesses to $143 million liquidation value *in place* by Debtor's witnesses. | 40.0 |

We reject the liquidation in place valuation. "Liquidation in place" contemplates a bulk sale of all of the Debtor's assets. The value of an entity which has historically operated at a loss is questionable. The witness who testified that the liquidation in place value is $143 million also testified that the orderly liquidation value is $43 million. That witness ignored the cost of disposal and the carrying costs until disposal. We have determined the value accordingly.

| | |
|---|---|
| Brainard Facility | 1.5 |
| Coal Coating Facility | 3.0 |
| Masury Facility | .8 |
| Railroad Antitrust Lawsuit—Debtor asserts a value of 7.5 million, which the Lenders assert is subject to attorney's fees for collection. We have reduced the value to take into consideration the delay and any fees which may have to be paid. | 6.0 |
| Real estate—Debtor's witnesses assert a value of 16.0 million. Bank's witnesses assert no value due to environmental problems. We believe the properties have some value although substantially less than the Debtor asserts. | 6.0 |
| Monessen—Caster, value not in dispute. | 6.0 |
| Monessen—Coke batteries and other equipment—Debtor presented evidence of values as high as 22 million. Lender's witnesses assert a value of $2.5–3.5 million. We believe that with the strengthening steel market, this property may be marketable. However, similar properties are for sale and have not been sold. The Debtor contemplates a quick sale and may have to accept a reduced price. | 10.0 |
| Union facility | 1.0 |
| Dearborn facility | 1.0 |
| Total value of assets | 138.9 |

The liquidation value of all of the Debtor's assets is $138.9 million. Against the $138.9 million in assets are liens totalling approximately $130.0 million as of March 31, 1993. Thus, all of the secured debt is presently covered, leaving a minor amount of equity ($136.9 − 130.0 = $8.9 million in equity). Interest continues to accrue on the secured debt.

■ Approximately $32.0 million of the Debtor's secured obligations, however, are junior to the Lenders in priority. The junior interests need not be considered in mak-

ing a determination of the Lender's adequate protection. *See In re Mellor,* 734 F.2d 1396 (9th Cir.1984). Thus, the Lenders (the only parties objecting to the Debtor's use of cash collateral) have a larger equity cushion to protect them. (The equity cushion for the Lenders is $138.9 − 130.0 + 32.0 = $40.9 million.) [2]

It is of some significance that the junior lienholders (Cleveland Cliffs, Trustees for Sharon Steel Pension Plans and Sharon Steel Corporation Retiree Plans and United Steelworkers of America) do not oppose the Debtor's Motion. They stand to lose $32 million before the Lenders suffer a loss if the Debtor restarts operations and the Business Plan fails. However, as history shows, the Debtor has the capability of losing in excess of $32 million in just a few months.

We have heard no mention from the junior lien-holders that they would waive their liens. Thus, in the event the Business Plan fails, the junior lienholders would consume any remaining assets. There would be nothing left for future suppliers of labor and materials whose claims remain unpaid at the time of a future shut-down.

Also, the junior lienholders may now fear that the value of the assets is less than the Debtor asserts, that they are now undersecured, and that their only hope of payment lies in the hope that the Business Plan is successful. With these considerations in mind, the consent of the junior lienholders must be taken with a grain of salt.

■ If the Court permits the operation to continue, then the public, the employees and suppliers have a right to assume that we have concluded that the Debtor will be able to pay postpetition debt. In fact, if the Plan fails, all available assets will be taken by the Lenders and junior lienholders, so that there will be no money to pay administrative claims of employees, suppliers and taxing bodies.

It is inappropriate for this Court to assist in the launching of this Debtor back into the business world, foisting it on an unsuspecting business community which may not know that extensions of postpetition credit, left over after a failure of the Business Plan, will not be paid.

*Business Plan*

■ The Business Plan provides for the Debtor to resume manufacturing operations after a short (3 week) preparation period. The Business Plan contemplates losses in excess of $12 million over the first four months. A portion of these losses are incurred in covering fixed costs while the Debtor gets up to speed. The Debtor contemplates a profit for the 12 month period of 5.6 million.

The profit is achieved by "ramping up" operations in month 8 of the Business Plan. The Debtor believes that it can sell its Monessen coke ovens and assumes a sale in month 7, providing additional cash for inventory which it can promptly convert into increased sales and profit.

The Plan is ambitious. It was prepared by the Debtor at a critical time in a do-or-die situation. It is nevertheless carefully crafted, but assumes improved performance throughout. It contemplates termination of blast furnace and basic oxygen furnace operations. Steel will be made from scrap in the electric arc furnace. Additional slab steel will be purchased. High carbon steel will be emphasized in the rolling mill production and low carbon steel will be minimized.

The brightest spot for this Debtor is the current trend in the steel industry—prices and demand are up in 1993. The market appears strong. The brightness dims, however, as it appears likely that such a strong market is only temporary as the market is presently unusually strong for the following reasons:

**2.** The Debtor's total secured debt of $130 million is comprised of approximately $14 million senior to that of the Lenders, $84 million to the Lenders and $32 million which is junior to the Lenders in priority.

1) Temporarily reduced supply from foreign markets.

2) Automakers are building inventory (and using more steel) in anticipation of a potential strike by the United Autoworkers.

3) Users of steel are building inventory in anticipation of a potential strike by the United Steelworkers at major steel producers.

We find many more problems which this Debtor faces.

During its absence from the industry (November–April), the Debtor's customers have had to find new suppliers. At the December hearing, the Debtor stated that it had lost strength and could not suffer any delay in restarting operations as it was losing customers daily. Since that time, over four additional months have passed. Many of the Debtor's customers have experienced a higher quality product purchased from the Debtor's competitors which the Debtor is not capable of producing. The Debtor believes that it can regain its customer base and achieve its expanded sales projections—a result which we find is unlikely.

The Business Plan contemplates selling more of the Debtor's higher margin products than it has in the past. Certainly, the Debtor would have sold as much as possible of its higher margin products before the bankruptcy. The Debtor contemplates increases in income by doing additional conversion work on product which belongs to customers. We find it unlikely that such increases will be possible.

The Debtor will have to purchase a portion of its raw materials (slabs) on the spot market in the absence of long-term contracts. Although this Debtor anticipates no delays, we conclude that delays are likely.

The Debtor has suffered substantial losses. To curb those losses, the Debtor indicates that it plans certain cost reductions. We note that this Debtor's predecessor, Old Sharon, having already been through one bankruptcy, has likely previously taken all possible cost reduction measures.

The Business Plan contemplates termination of the existing pension plan. Although this is a likely possibility, the Pension Benefit Guaranty Corporation has not acquiesced.

Concessions by the United Steelworkers are contemplated. The Union has agreed to such concessions. However, the concessions are subject to ratification by the members and we have no indication that the members will accept.

(Approval of Debtor's proposal would necessarily be conditioned on termination of the pension plan and ratification of the collective bargaining agreement.)

The Business Plan also contemplates a sale of the Monessen Coke facilities by month 7. The Debtor has been in bankruptcy since November 1992. It has no offers on this facility and has not hired a broker to seek a buyer. It is unlikely that a sale can be consummated by month 7. Without the sale or if there is a delay in the sale, the Debtor cannot increase its inventory purchases and obtain the resulting increase in sales and profits shown in the Business Plan.

In addition, the Business Plan contemplates increases in the prices of steel products, increased yields in the manufacturing process, lower cost of production by reducing man hours, a lower dilution rate in accounts receivable and quicker collection of accounts receivable. Although attractive, this series of events cannot be met.

We believe that the Debtor has overstated its strengths and underestimated the obstacles which it faces. Accordingly, we conclude that the Debtor's projections cannot be met.

The Business Plan stretches everything to the limit and beyond. The Business Plan is unrealistic and unattainable and the Debtor, if permitted to restart operations, will likely suffer significant losses.

*Conclusion*

The Debtor's Business Plan is unduly optimistic. It fails to see the barriers. Allowing this Debtor to recommence the operation envisioned in the Business Plan will raise false hopes of success in the Debtor, its employees, suppliers and the community. Without new capital to permit this Debtor to make needed capital expenditures to make it competitive and to provide working capital, the Debtor will again be unable to sustain operations within a short time. Losses can quickly mount, not only eroding any equity cushion for the objecting Lenders, but also allowing the employees and postpetition unsecured creditors to become unsuspecting and unwilling contributors to the Debtor's unfortunate situation.

For the foregoing reasons, the Motion will be refused.

### ORDER

This 23rd day of April, 1993, in accordance with the accompanying OPINION, it shall be, and hereby is, ORDERED as follows:

1. The Debtor's Motion for an Order Granting Authorization to Use Cash Collateral is REFUSED.

2. The Debtor shall cooperate with the secured Lenders and limit expenditures to those the secured Lenders deem necessary to protect the Debtor's assets.