## In re SHAW INDUSTRIES, INC., Debtor.

### Shaw Industries, Inc., Movant

### v.

**First National Bank of PA, Northwest PA Regional Planning & Development Commission and Northwest Small Business Federal Funding, Respondents.**

#### Bankruptcy No. 03–11341.
#### Docket No. 45.

United States Bankruptcy Court, W.D. Pennsylvania.

Nov. 10, 2003.

James R. Walczak, Esq., Erie, PA, for First National Bank of PA.

James M. Greenfield, Esq., Franklin, PA, Attorney for Northwest Regional Planning & Development Commission and Northwest Small Business Federal Funding.

Robert S. Bernstein, Esq., Pittsburgh, PA, for Shaw Industries, Inc.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Shaw Industries, Inc. ("Shaw" or "Debtor") filed a voluntary Petition under Chapter 11 of the Bankruptcy Code on June 1, 2003. At the time of the filing of the Petition, Shaw had two secured creditors—First National Bank of Pennsylvania (the "Bank") and Northwest Regional Planning & Development Commission and Northwest Small Business Federal Funding (collectively, the "Commission"). Pres-

---

1. This Opinion constitutes our findings of fact and conclusions of law.

ently before the Court is Shaw's EMERGENCY MOTION FOR AUTHORITY TO INCUR SENIOR SECURED DEBT ("Motion"). Shaw seeks authority to incur a new obligation for a working capital line of credit in the amount of $600,000 and to provide the new lender with *inter alia* a lien on all of the Debtor's assets, senior to liens held by FNB and the Commission. FNB and the Commission oppose the Motion. An evidentiary hearing was held on October 23, 2003. FNB and Shaw have filed post-trial briefs. The matter is ripe for decision.

### Facts

Shaw operates in the tool and die industry. It has been in business since 1941. Shaw designs and builds plastic injection and compression molds.

Shaw experienced financial difficulties for several years prior to the bankruptcy filing. A primary cause of the downturn was and continues to be the severely depressed condition of the tool and die industry. Tool and die business constitutes approximately 80% of Shaw's revenue. In January, 2002, FNB, Shaw's primary secured lender, requested that Shaw find a new lender to refinance its obligations and pay off the Bank. Shaw was not successful in its efforts to locate a new lender.

Shaw's financial statements indicate the following results for the past five fiscal years:

Fiscal Year Ending
(in thousands)

| | 9/30/99 | 9/30/00 | 9/30/01 | 9/30/02 | 9/30/03 |
|---|---|---|---|---|---|
| Sales | $4,854 | 4,623 | 4,502 | 3,331 | 1,717 |
| Profit (Loss) | 214 | (245) | (125) | (259) | (488) |
| Net Worth | $1,488 | 1,243 | 1,123 | 850 | 362 |

2. Mr. Shaw is the majority shareholder of the Debtor, but has not been active in the business for several years.

3. Shaw has a letter from a commercial lender which indicates that such loan is approved

Shaw reacted to the downturn by cutting costs. The number of employees was cut from a high of 50 to 60 to 23 by the summer of 2001 and remains at that level today. By January, 2003, Shaw had instituted all possible cost-cutting measures with the exception of the elimination of Mr. Shaw's $10,000 per month salary which ceased in June, 2003.[2] Despite all of Shaw's prior cost-cutting efforts, its financial situation continued to deteriorate. By Spring, 2003, Shaw was close to running out of cash and needed to secure additional financing to continue to operate. On the advice of Shaw's financial consultant, Shaw filed its Chapter 11 Petition on June 1, 2003 with the intention to seek authority to obtain postpetition financing by granting a lender a secured lien on Shaw's assets.

Shaw has made significant efforts to obtain alternative financing. It has contacted numerous lenders, both institutions and individuals. Shaw has sought and been receptive to all financing alternatives including unsecured loans, or loans secured by a lien position junior to that of its present lenders. The only loan that it has a possibility of obtaining is a line of credit in the amount of $600,000 with a lien position senior to that of FNB and the Commission.[3]

Shaw's losses have continued postpetition. Its monthly operating reports indicate the following results by month:

| | Profit (Loss) |
|---|---|
| June, 2003 | ($ 60,756) |
| July, 2003 | ( 8,288) |
| August, 2003 | 22,605 |
| September, 2003 | ( 61,988) |
| Total | ($108,427) [4] |

subject to a forthcoming formal approval letter.

4. Debtor's President testified that the June report contains an error and that the total postpetition loss is actually $93,500.

Based on this performance, Shaw is on track to lose between $280,000 and $325,000 on an annual basis.

Shaw continues to consume working capital faster than it is being produced. During the postpetition period, current assets have increased by $158,814. Postpetition liabilities are $317,393. The result is that postpetition liabilities exceed the increase in current assets by $158,579.

Shaw presents a projected income statement for its fiscal year ending September, 2004. The projection is not realistic. Shaw projects sales of $3,937,149. This sales projection is more than double Shaw's total sales of $1,717,000 for fiscal year ended September 30, 2003. There is no evidence to indicate that such an increase is possible. Debtor is pursuing sales, but the evidence is that the tool and die industry is at rock bottom, and at best, projections are only for slight improvement. The decline of the tool and die industry is structural, rather than cyclical in nature, and is unlikely to abate in the reasonably foreseeable future.

In addition to a dramatic increase in sales, Shaw's projection contemplates significant reductions in cost of goods and operating expenses. Shaw's projections show a reduction in cost of goods from 82% in fiscal year 2003 to 68% in fiscal year 2004. The lowest cost of goods attained by Shaw in the past 8 years is 73%. Shaw offers no explanation for this unrealistic change.

The Debtor's assets consist of real estate and equipment. The parties have stipulated to the asset values:

Real Estate
Fair market value $2,700,000–2,900,000
Liquidation value $2,092,500–2,247,500

Equipment
Liquidation value $1,000,000

Real Estate and Equipment
Combined liquidation value $3,092,500–3,247,500

Shaw owns a parcel of property located at the intersection of Front Street and Route 8/route 62 in Franklin, Pennsylvania. There are three components to the property: (1) an area leased to Eat 'N Park Restaurant; (2) an area leased to David Brody d/b/a Seneca Realty Associates; and (3) the area on which Shaw's manufacturing facility is located. The property is not subdivided, but there are no legal or other restrictions to prevent the subdivision.

The manufacturing facility consists of two large buildings and adjoining office space. It shares a common drive with the Eat 'N Park Restaurant.

The Brody Lease is a 75 year lease which commenced on September 1, 1992. It provides an access way from Front Street to an adjoining shopping area. Shaw receives rent in the amount of $800 per month from the Brody Lease. The rent is scheduled to increase to $1,600 per month in 2017 and $2,400 per month in 2042.

The Eat 'N Park Lease is a twenty five year, triple net lease, which commenced on May 17, 1995. Rental payments are $6,250 per month.

FNB has urged Shaw to sell the Brody and/or the Eat 'N Park sections of the property. Shaw has received verbal offers from a reputable real estate broker suggesting that he had someone that may be interested in paying as much as a million dollars for the Eat 'N Park portion of the property. Despite having no reason to believe that the offer was not a bonafide offer, Debtor has been unwilling to consider sale of the Eat 'N Park portion of the property.

Shaw has recently filed motions to obtain authority to sell certain pieces of excess equipment and a life insurance policy on the life of its principal shareholder, Mr.

Shaw. Debtor indicates that it expects to close shortly on the sale of one piece of equipment for $14,000 and that it hopes to generate $100,000 from the sale of the life insurance policies.

The parties have also stipulated to the amount of the Debtor's secured debt (as of October 21, 2003):

| | |
|---|---|
| First National Bank (four loans) | $1,676,811.61 |
| Northwest Planning Commission (two loans) | 211,527.82 |
| Total Secured Debt | $1,888,339.43 |

Under the terms of the cash collateral order in this case, Shaw is paying FNB $10,000 per month.

### Discussion

Section 364[5] governs the obtaining of credit or incurring of debt by a trustee.[6] Section 364(d) provides:

> (d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

■ Debtor has the burden to establish that it is unable to obtain credit without providing a lien senior to the liens held by FNB and the Commission and Debtor must establish that FNB and the Commission are adequately protected. *In re Swedeland Development Group, Inc.*, 16 F.3d 552 (3d Cir.1994).

Shaw has met its burden as to the first test, i.e., that it is unable to obtain credit without providing a senior lien. Shaw has sought financing from numerous lenders, both commercial institutions and individuals. Shaw has been unable to obtain any credit on any basis from any lender except for the proposal which is presently before the Court.

■ The second test, that there is adequate protection of FNB's interest, is more problematic.

The purpose of providing "adequate protection" is to insure that a secured creditor receives in value essentially what he bargained for. *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir.1987); H.R.Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), *reprinted in* 1978 *U.S.Code Cong. & Admin. News*, pp. 5787, 6295. The means of adequate protection provided by § 361 are not exclusive. *In re O'Connor*, 808 F.2d at 1397; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984). Exactly what constitutes adequate protection must be decided on a case by case basis. *In re O'Connor*, 808 F.2d at 1396–97.

The existence of an equity cushion alone can constitute adequate protection. *In re Mellor*, 734 F.2d 1396 (9th Cir.1984); *In re Lane*, 108 B.R. 6 [(]Bankr.D.Mass. 1989) *and cases cited therein; In re Grant Broadcasting of Phila., Inc.*, 75 B.R. 819, 823–24 (E.D.Pa.1987). We believe it improper to look at valuation of assets in a vacuum. While the present

---

5. All references to Code sections are to Title 11 of the United States Code unless otherwise indicated.

6. Under § 1107(a), "a debtor-in-possession shall have all rights...and powers...of a trustee." 11 U.S.C. § 1107(a)

value of a debtor's assets may be sufficient to constitute adequate protection, a debtor's future operational plans may result in a rapid deterioration of the collateral. Where an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection. *See In re Liona Corp.*, 68 B.R. 761, 767 (Bankr.E.D.Pa. 1987).

*In re Sharon Steel Corp.*, 159 B.R. 165, 169 (Bankr.W.D.Pa.1993).

■ FNB and the Commission are oversecured. The liquidation value of Debtor's real estate and equipment is, at the low end, $3,092,500 and the balance due secured creditors is $1,888,339. The senior secured loan proposed by the Debtor is $600,000 and an examination of the values and loan balances alone would lead one to a conclusion that there is sufficient equity to permit the loan and still leave adequate protection for FNB and the Commission.

The problem is that any equity this Debtor has is rapidly eroding due to significant losses. Debtor lost $488,000 for its fiscal year ended September 30, 2003. Its losses have nearly doubled each year for the past three years beginning with a loss of $125,000 in 2001, increasing to a loss of $259,000 in 2002. Losses have continued postpetition even though all possible cost-cutting measures were in place prior to the bankruptcy filing (with the exception of Mr. Shaw's salary). Debtor is poised to lose between $280,000 and $325,000 during the present fiscal year.

Debtor presents an income projection for the coming year which shows a return to profitability. It does so by projecting that its sales will double and its cost of goods will be reduced far below any historic level. The projection lacks foundation. There is no evidentiary basis to support such a projection.

Any equity cushion will quickly erode. The structural foundation of the tool and die industry in which the Debtor operates is faltering. Debtor's prospects are inherently risky. It is inappropriate to foist this risk upon FNB.

Debtor's Motion must be refused. An appropriate Order will be entered.

### ORDER

This 10 day of November, 2003, in accordance with the accompanying Opinion, it is ORDERED that the EMERGENCY MOTION FOR AUTHORITY TO INCUR SENIOR SECURED DEBT filed by Shaw Industries, Inc. is REFUSED.